Fremont-Smith, J.
The plaintiff Arthur J. Licari, as Trustee of Colonial Drive Realty Trust (“Colonial”) seeks damages from the defendants Town of Ipswich, its Building Inspector, Joseph Ferruzzi (“Ferruzzi”), its Town Planner, Elizabeth Ware (“Ware”), and from the members of its Planning Board, Patrick J. McNally, Stanley I. Bornstein, Kenneth J. Savoie, William E. Bingham, and Catherine Lefebvre Savoie, for allegedly thwarting Colonial’s attempt to construct a townhouse development on property it owned in Ipswich, Massachusetts. Colonial has alleged interference with contractual relations (Count I), violation of the Massachusetts Civil Rights Act (“MCRA”), G.L.c. 12, §11 (H) and (I) (Count II), and vicarious liability for breach of the MCRA against the Town of Ipswich (Count III). The defendants have filed a joint motion for summary judgment. For the reasons stated below, the defendants’ motion is allowed.
BACKGROUND
Colonial is the record owner of real estate known as Lots 1A and 2A, located at the junction of Topsfield Road and Colonial Drive in Ipswich, Massachusetts. In 1987, Colonial’s predecessor in title, Ipswich Bay, developed a plan to build twenty-two condominium townhouses on the property. The plan contemplated the construction of three buildings containing a total of twelve units on Lot 1A, and three buildings containing a total of ten units on Lot 2A.
In February of 1987, Ipswich Bay petitioned the Planning Board of the Town of Ipswich (“the Planning Board”) for a special permit to proceed with the project. Although the density for the proposed project complied with the zoning bylaw, the Planning Board expressed considerable concern over the density. Ultimately, on August 6, 1987, the Planning Board issued the special permit for twenty-two units. The special permit expressly incorporated the building plans, which provided that there would be approximately forty-five feet between Building Three on Lot 1A and Topsfield Road, but contained no other dimensions for the location of any of the buildings.
In August, 1987, Colonial became the successor in interest to Ipswich Bay, and obtained construction financing through the Eastern Savings Bank (“Eastern”). Colonial, the Planning Board, and Eastern signed a Tripartite Agreement in early 1988, wherein Eastern committed to provide Colonial a two-year, $2,800,000 construction loan. The loan was scheduled to expire in August, 1990.
On June 22, 1988, pursuant to the special permit, Ferruzzi issued three foundation permits for three buildings on Lot 1A. In late 1988, after the foundations were in place, Ferruzzi issued three building permits for framing and completion of the three buildings. Work commenced on the buildings.
In the summer of 1989, Colonial sought amendments to the special permit (primarily related to landscaping, garages, decks, and fencing), which were discussed at the Planning Board’s September 14,1989 meeting and were approved on November 10, 1989.
Meanwhile, at a public hearing held on October 12, 1989, the Planning Board discussed whether the location of Building Three on Lot 1A was too close to Topsfield Road, in violation of the special permit dimensional requirement. On October, 19, 1989, Ware wrote to Colonial and informed it that Building Three was seven feet closer to the road than the special permit allowed, and requested that Colonial either confirm or deny this non-compliance prior to the Planning Board’s October 26 meeting. She informed Colonial that any discrepancies between the buildings and the special permit would require a public hearing on any proposed changes and an amendment to the special permit. Ware also informed Colonial that any further work on the project would be at the developer’s risk. During the October 26, 1989 meeting, the Planning Board issued, and later recorded, a “Notice of Noncompliance with the Special Permit Authorizing Use,” based on the alleged discrepancy between the dimensional requirement in the special permit and the location of Building Three on Lot 1 A.
In early November, 1989, the Planning Board informed Colonial that Buildings One and Two also did not conform to the special permit. Colonial disagreed. *579 The parties attempted to reach a compromise on their differences, but were unable to do so. Thereafter, Colonial sought a further amendment to the special permit to cure the alleged dimensional non-conformities. At that meeting, Colonial’s engineer acknowledged that the building nearest to Topsfield Road was approximately nine feet off of the original approval. A hearing on Colonial’s application for further amendment was held on November 30, 1989. Colonial agreed to compromise, but would not reduce the number of units in the project. The Planning Board made no decision on Colonial’s application for further amendment to the special permit, although the parties continued to negotiate.
At the February 1, 1990 Planning Board meeting, the parties again disputed whether the project conformed to the special permit, and on February 2, 1990, Ferruzzi revoked all three building permits for Lot 1A, based on the alleged discrepancies between the buildings’ actual locations and those specified in the special permit.[1] He ordered that all further work cease immediately.
On March 7, 1990, Colonial appealed Ferruzzi’s revocation to the State Building Code Appeals Board, and informed Ferruzzi that it would continue work at its own risk.
Colonial and the Planning Board eventually reached a compromise, and on April 2, 1990, the latter issued a second amended special permit. Pursuant to their compromise, Colonial agreed to reduce the total number of units from twenty-two to twenty, and the Planning Board approved the “as built” locations of the three buildings on Lot 1A.
Despite the issuance of the special permit, work could not continue on the project until new building permits were issued. In late May, 1990, Ferruzzi agreed to issue new building permits, but did not do so until August, 1990. As Colonial’s financing commitment for the project expired in August, 1990, it was unable to complete the development and defaulted on its loan.
In January, 1993, Colonial filed suit against the defendants in the Federal District Court in Boston, alleging violation of its federal and state civil rights, and interference with contractual relations. The District Court dismissed the action without opinion. The First Circuit Court of Appeals upheld the dismissal of the federal civil rights claims, but reversed the dismissal of the state law claims and remanded the case to the District Court with orders to either permit the case to proceed or to dismiss it without prejudice so that it could be refiled in state court. The District Court rejected pending jurisdiction and dismissed the case without prejudice, and this suit followed.
DISCUSSION
The gravamen of Colonial’s complaint is that the defendants intentionally interfered with the project due to concerns over density, despite the fact that the density for the project complied with the town’s zoning bylaw.[2] Colonial alleges that the defendants used dilatory tactics to forestall and interfere with the development in an eventually successful attempt to coerce its compliance to a reduced density for the project, which led to the project’s eventual collapse.
In addition to disputing Colonial’s characterization of their actions, the defendants claim that they are, on any view of the facts, entitled to summary judgment on several independent grounds. First, the individual Planning Board defendants allege that Colonial’s claims are barred because G.L.c. 40A, §17 provides, as a matter of law, the “exclusive” remedy for appealing decisions regarding the issuance or non-issuance of a special permit. Secondly, they contend that Colonial, on any view of the facts, cannot establish the essential legal elements of a claim for intentional interference with contractual relations (Count I). Thirdly, the individual defendants claim that they are entitled to summary judgment on Count II (Colonial’s MCRA claim) because, on any view of the facts, there is no evidence of acts which could constitute a deprivation of Colonial’s rights by the requisite “threats, intimidation, or coercion” and that, in any event, the defendants would be entitled to a judgment based upon their qualified immunity as municipal agents in the performance of discretionary duties. Finally, the defendant Town of Ipswich (“the Town”) contends that it is entitled to summary judgment on Count III because Colonial cannot make out an MCRA claim under Count II, and because the town, in any event, cannot be held to be vicariously liable for the conduct of its agents.
I. Summary Judgment Standard
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassessov. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further,] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial, may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). Accord Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
II. G.L.c. 40A, §17
In support of the defendants’ first defense that plaintiffs claims are barred because its exclusive statutory remedy was an appeal pursuant to G.L.c. 40, *580 §17,[3] the defendants contend that Colonial’s suit “rests upon dissatisfaction with various decisions of the defendants in connection with a special permit to construct a cluster development!,]” so that its failure to appeal those decisions within the time period set forth in §17 is “fatal to this suit.” (Defendants’ brief at 12.) Defendants suggest that, having already dropped the ball, Colonial is attempting an “end-run” around §17.
Colonial rejoins that the defendants’ argument is facially flawed with respect to Ferruzzi and Ware, because neither was a member of any “special permit granting authority” in the town, and also contends that §17 applies only to appeals of formal, written decisions by “special permit granting authorities,” whereas Colonial’s suit is not predicated upon dissatisfaction with any specific decision or a failure to act by the Planning Board, but upon a “persistent course of coercive, threatening and intimidating conduct” intended to “strongarm” Colonial into reducing the number of units in the project — conduct for which §17 offers no remedy. (Colonial’s brief at 21.)
Putting aside the fact that neither Ferruzzi nor Ware were members of the “special permit granting authority,” the difficulty with the defendants’ argument is that, so far as we aire aware, no court has construed §17 as constituting a bar or prerequisite to maintaining a tort or Civil Rights action against members of a special permit granting authority.
Moreover, other than the February 2, 1990 revocation of the building permits, it is not clear that there were any other formal Planning Board decisions from which Colonial could have appealed.[4] Nor does the cost provision of § 17[5] require a contrary result, as that provision applies only where a special permit granting authority has made a formal, appealable decision, and does not otherwise evince a legislative intent to preclude claims such as those of Colonial. Accordingly, the Court does not conclude that § 17 constitutes a bar to plaintiffs claims with respect to any of the defendants.
III. Intentional Interference with Contractual Relations
In Count I of the complaint, Colonial alleges that the defendants intentionally interfered with its contractual relations, i.e. its financing commitment with the bank, citing the Restatement (Second) of Torts, §766A — Intentional Interference with Another’s Performance of His Own Contract, which provides:
One who intentionally and improperly interferes with the performance of a contract (except a contract to many) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.
To date, although there may be valid grounds to do so, the Appellate Courts of Massachusetts have not yet recognized the tort set forth in §766A. But see Continental Health Care VII, L.P., et al. v. Continuum Care Corp., 23 M.L.W. 987 (Superior Court, Butler, J.) (1/30/95). This Court, however, need not consider whether §766A should be followed here, because the individual defendants are, in any event, entitled to immunity at common law as discretionary employees.[6]
In Gildea v. Ellershaw, 363 Mass. 800, 820 (1973), the Court stated:
rW]e hold that the law of the Commonwealth should be, and therefore is, that if a public officer other than a judicial officer, is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby. This rule is presently limited to public officers acting in good faith, without malice and without corruption.
In order to recover, Colonial must show that the defendants “performed their official discretionary acts in bad faith, with malice, or corruptly.”[7] Ramos v. Board of Selectmen of Nantucket, 16 Mass.App.Ct. 308, 314 (1983). In Spiegel v. Beacon Participations, Inc., 297 Mass. 398, 416-17 (1937), the Court defined bad faith as importing a “dishonest purpose or moral obliquity,” implying a “conscious doing of wrong,” or a “breach of a known duty through some motive of interest or ill will.”[8]
While the defendants here could be found to have been overzealous, there are no facts upon which a jury could reasonably infer malice or bad faith, as defined, so as to overcome defendants’ qualified immunity. See Ramos, supra at 314. Accordingly, the defendants are entitled to summary judgment on Count I.
IV. Massachusetts Civil Rights Act, G.L.c. 12, §11(1) and (H)
In Count II of the Complaint, Colonial alleges that the defendants’ actions violated the Massachusetts Civil Rights Act, G.L.c. 12, §11(H) and (I).[9] To establish a claim under the MCRA, Colonial “must prove that (1) [its] exercise or enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by ‘threats, intimidation, or coercion.’ ” Bally v. Northeastern University, 403 Mass. 713, 717 (1989). See Freeman v. Planning Board ofWestBoylston, 419 Mass. 548, 564 (1995). In order to be liable under the MCRA, “a defendant must force, or'seek to force, the plaintiff‘to do or not to do’ something.” Marjorie Heins, Massa *581 chusetts Civil Rights Law 76, Mass. L. Rev. 77, 82 (1991) (Part II), quoting Pheasant Ridge Assoc. Ltd. Partnership v. Town of Burlington, 399 Mass. 771, 781 (1987).
As Colonial’s federal civil rights and due process claims were disposed of in Licari v. Ferruzzi, 22 F.3d 344 (1st Cir. 1994), Colonial’s MCRA claim must be predicated upon a violation of state law.
Colonial does allege a violation of at least one clearly established legal right, i.e. that Ferruzzi’s revocation of the building permits violated state law because he was ordered to do so by the Planning Board and “a building inspector may not lawfully revoke a building permit unless he has made a determination based upon his own independent judgment that the work violates the permit.”[10] (Colonial’s brief at 26; Sokolov affidavit, ¶25). See Oulette v. Building Inspector of Quincy, 362 Mass. 272 (1972); Castelli v. Board of Selectmen of Seekonk, 15 Mass.App.Ct. 711 (1983). The question remains, however, whether the defendants’ actions constitute “coercion” within the meaning of the MCRA.[11] Colonial alleges that it was coerced into surrendering its right to develop twenty-two units on the property, which was permitted under the zoning bylaw, by the Planning Board’s false claim that the buildings (Buildings One and Two in particular) did not conform to the special permit, and that the defendants essentially conditioned the issuance of the second amended special permit on Colonial’s coerced agreement to reduce the size of the project from the legally permitted twenty-two units to twenty.
“Coercion” is the use of physical or moral force to compel another to act or assent. Freeman v. Planning Board of West Boylston, 419 Mass. 548, 565 (1995), quoting Webster’s New Third Int’l Dictionary 439 (1981). In Freeman, however, the Supreme Judicial Court held that where a planning board improperly withheld and delayed approval of a subdivision plan in an attempt to exact a concession from the developer on the design of a street intersection, the board’s “efforts ... to impose an unwarranted condition related to concerns about safety did not interfere with the plaintiffs rights in the land by coercion” because it “erroneously sought a concession (the improvement of the intersection) legitimately related to one of the purposes of the subdivision control law.” 419 Mass, at 566.
Here, as in Freeman, the defendants sought a concession from Colonial legitimately related to one of the purposes of the zoning bylaw — density, and here, as in Freeman, there is “no evidence of personal animus, that other developers were treated more favorably than the plaintiff, or that board members stood to profit personally from their action.” Id. at 563. The Court therefore concludes that here, as in Freeman, “defendants’ efforts in this case to impose an unwarranted condition related to concerns about [density] did not interfere with the plaintiffs rights in the land by coercion.” Id. at 566 n.18.
V. Town of Ipswich
A Town cannot be held liable where the underlying civil rights claim against its employees cannot be established. Additionally, even if Colonial could establish a MCRA claim against the individual defendants, the Town could not be held liable on a respondeat superior theory. Broderick v. Roache, 803 F.Supp. 480, 484 (D.Mass. 1992), affirmed, 996 F.2d 1294 (1st Cir. 1993); Jones v. City of Boston, 738 F.Supp. 604, 606 (D.Mass. 1990). Nor is there any evidence that the town had any established policy to violate Colonial’s constitutional rights. See Monell v. Department of Social Services, 436 U.S. 658, 694 (1978).
In this latter regard, Colonial’s reliance on Pembaur v. City of Cincinnati, 475 U.S. 469 (1986), is misplaced. Under Pembaur, a municipality can be held liable under 42 U.S.C. §1983 “where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.” 475 U.S. at 483-84. Relying on Pembaur, Colonial asserts that the individual defendants were, with respect to zoning matters, the responsible policy making officials of the Town, thereby subjecting the Town to liability for their civil rights violations.
Colonial’s claim under Pembaur, however, is deficient because the individual defendants were not, as a matter of law, the responsible policy making officials of the Town, even with respect to zoning matters. The governing body of a town, of course, is the aldermanic body, which enacts zoning and other ordinances. While, as averred by Colonial’s counsel, “under Ipswich’s Zoning By-law, Section XI, A, the sole enforcement officer of that By-Law is the Building Inspector,” enforcement authority is not the equivalent of policymaking authority. While an enforcement officer carries out the policies of the zoning ordinance, he does not establish those policies.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendants’ Joint Motion for Summary Judgment be ALLOWED with respect to all counts of the complaint.

As noted above, the only set-back requirement in the permit related to Building Three.

The zoning bylaw is not before the Court.

General Laws c. 40A provides in relevant part:
Any person aggrieved by a decision of the board of appeals or any special permit granting authority . . . may appeal to the land court department, the superior court department in which the land is situated ... or to the division of the district court department within whose jurisdiction the land is situated ... by bringing an action within twenty days after the decision has been filed in the office of the city or town clerk . . . The complaint shall allege that the decision exceeds the authority of the board or authority, *582 and any facts pertinent to the issue, and shall contain a prayer that the decision be annulled.
The court shall hear all evidence pertinent to the authority of the board or special permit granting authority and determine the facts, and, upon the facts as so determined, annul such decision if found to exceed the authority of such board or special permit granting authority or make such other decree as justice and equity may require. The foregoing remedy shall be exclusive . . .

Colonial did appeal the revocation of the building permits, but when Ferruzzi later agreed to reissue the building permits, Colonial abandoned that appeal.

Section 17 permits costs to be assessed against the special permit granting authority if it acted with gross negligence, in bad faith, or with malice, in rendering the decision appealed from.

General Laws c. 258, the Massachusetts Torts Claims Act, is inapplicable to the intentional tort and civil rights violations alleged in the complaint.

Additionally, the “malice” exception to immunity under Gildea must also be considered in light of the principle that “[tjhere is every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare.” Ramos, supra at 314, quoting Foster from Gloucester, Inc. u. City Council of Gloucester, 10 Mass.App.Ct. 284, 294 (1980). See LaPointe v. License Bd. of Worcester, 389 Mass. 454, 459 (1983).

Webster’s New World Dictionary of the American Language 857 (Second College Ed. 1980) similarly defines “malice” as connoting an “active ill will” and a “desire to harm another," which “implies a deep-seated animosity that delights in causing others to suffer or in seeing them suffer.”

General Laws c. 12, §11 (H) provides:
Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured.
General Laws c. 12, §11(1) provides:
Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys fees in an amount to be fixed by the court.

In view of the fact that one of the buildings was built too close to the road, it is not clear that the revocation of Colonial’s building permits was otherwise unlawful.

 There are no allegations of threats or intimidation.