Fahey, J.
This case is before this court on remand from the Massachusetts Appeals Court. Craft v. Kane, 51 Mass.App.Ct. 648, 653-54 (2001). The Appeals Court heard Attorney Carlo Cellai’s (“Attorney Cellai”) appeal of this court’s (Whitehead, J.) denial of his motion [9 Mass. L. Rptr. 121] to establish and enforce an attorney’s lien. Id. at 648. Specifically, the Appeals Court asks that this court conduct a thorough exploration of the plaintiffs discharge of Attorney Cellai “to determine whether the discharge of Cellai was in bad faith or for good cause.” Id. at 653. The Appeals Court also asks that this court make “a final determination of the amount received by the executor and held by him under a constructive trust, to the extent that such amount constitutes the net proceeds of the fire insurance applicable to the damage to the real estate . . .” Id. at 653-54.
An evidentiaiy hearing was held in July 2004 on a Motion to Enforce an Attorney’s Lien. The issues to be determined are the amount held in the constructive trust and the value of the attorney’s services. For the reasons discussed below, this motion is allowed.

*44
FINDINGS OF FACT

These facts taken from the Background section of the Memorandum of Decision of Whitehead, J., are not disputed.
On January 18, 1993, the decedent, William E. Kelly, Jr. (“Kelly”), was smoking in bed at his residence located at 143 Bourne Avenue in Somerset. A fire ensued and, as a result, the dwelling was partially burned and Kelly was severely injured. Kelly suffered third-degree bums over 95 percent of his body and was taken by ambulance to Charlton Hospital. Kelly was subsequently airlifted to the burn unit at Massachusetts General Hospital. At some point, Kelly lost consciousness. On January 24, 1993, without having regained consciousness, Kelly died. From the time he was taken from the fire to the time of his death, Kelly was unable to communicate with his doctors or anyone else.
Kelly’s will contained the following specific bequest:
I give, devise and bequeath my real estate at 143 Bourne Avenue, Somerset, Massachusetts to FRANCES CRAFT (“Craft”), providing she survives me by thirty (30) days.
Kelly’s will further provided that Jeanne P. Louizos (“Louizos”) would take the remainder of his estate. Irving B. Kane (“Kane”) was named as the executor of the will.
Prior to his death, Kelly had insured the property in question and, in accordance with this policy, his insurance carrier paid the sum of $43,732.38 to Kelly’s estate.
Based on the credible evidence presented and the reasonable inferences drawn therefrom, I also find the following facts.
Craft was present in the home at the time of the fire and claimed to have sustained personal injury as a result. She was then engaged to Kelly and claimed her own physical injury and also emotional distress at witnessing Kelly’s injury. Craft and Attorney Cellai both signed in August 1993 a contingent fee agreement for him to represent her on her personal injury claim against the decedent Kelly. Two months later they both signed another contingent fee agreement concerning the “recovery for funds for the insurance proceeds paid out to the Estate of William Kelly for damage caused by the fire to 143 Bourne Avenue, Somerset.” The second contingency agreement was entered into due to Craft being the beneficiary under Kelly’s will of a specific bequest of the real estate at 143 Bourne Avenue, Somerset. In each Agreement, the client agreed to pay 1/3 of the gross recovery to Attorney Cellai. Both of the Agreements specified that “the client is not to be liable to pay compensation otherwise than from amounts collected for him (sic) by the Attorney, except as follows: None.” The Agreements also stated that “the client is in any event to be liable to the Attorney for his (sic) reasonable expenses and disbursements.”
The complaint that Attorney Cellai filed on October 14, 1993 on Craft’s behalf included a claim in Count I for physical injury, a claim in Count II for emotional distress, and a claim in Count III for loss of property; all of these claims were allegedly the result of Kelly’s negligence. The complaint also alleged that the executor had failed to reimburse Craft for expenses she incurred in repairing the property after the fire (Count IV), and that she was entitled by way of declaratory relief to the insurance proceeds received by the executor as a result of the fire (Count V). Craft’s claim for the insurance proceeds, Count V, “was premised around a unique and unified legal theory . . . which has never been ruled upon by the Court in the Commonwealth.” Exhibit 25, Appellant’s Brief, p. 12.
Craft spent her own money to “button up” the house after the fire; the executor refused initially to reimburse her for that. That Count IV claim settled in 1994 with payment to her in the amount of $1,650.00 out of which, because Craft was in dire financial straits, Attorney Cellai did not take his fee. Other than the settlement for $1,650.00 on Craft’s Count IV claim, Craft received no offers of settlement for her other claims while Attorney Cellai represented her.
When Attorney Cellai notified Kane that Craft claimed the insurance proceeds, Kane, pursuant to his fiduciary duties, researched whether Craft, a specific legatee under Kelly's will, or Louizos, the residuary legatee, was entitled to the insurance proceeds. The executor not only denied Craft’s claims, but also claimed that, because the house had burned and was uninhabitable, it had “adeemed,” such that the recoverable insurance for the damage to the real properly passed to the residual legatee. Kane informed Attorney Cellai that the insurance proceeds constituted personalty and therefore belonged to Louizos. Kane made this assertion in good faith but his arguments were, at least so far, unavailing.
Notwithstanding the novel theory asserted in Count V, Attorney Cellai moved for partial summary judgment on that claim in 1994[1] and was successful [2 Mass. L. Rptr. 395). The court (Donovan, J.) entered an order and an amended order in 1994 that the executor held the fire insurance proceeds in a constructive trust for the benefit of Craft but only to the extent that the proceeds of the policy represented damage to the real estate, not damage to the personal property, and subject also to the extent that the proceeds might be required to pay the decedent’s debts, funeral expenses, taxes, and costs and expenses of administration. Determining that the specific devise of Kelly’s house to Craft was not adeemed, the court also held that, if the estate’s expenses could be satisfied in their entirety from the estate’s other funds, the executor was to hold the real estate proceeds of the insurance policy in a constructive trust *45 for the benefit of Craft. Kane notified Attorney Cellai that he intended to appeal Justice Donovan’s decision when and if it ever became a final judgment.
The insurer paid the estate $43,732.38[2] for the fire damage based, at least in part, upon an adjustment by Panakio Adjustors (“Panakio”), who was hired to provide an estimate of the real estate damage and the personal property damage incurred as a result of the fire. I accept that of this $43,732.38 (less the $100.00 deductible), the amount of $26,115.97 was paid and recovered for damage to the real-estate and $17,616.41 was paid and recovered for damage to Kelly’s personalty. Panakio was paid $4,378.24 for his services. Attorney Cellai also claims that the expense paid to adjuster Panakio is a cost of administering the estate, rather than Craft’s obligation as Kane suggests. However, this court determines that it is reasonable to apportion Panakio’s fee by the same percentages of the recovery applicable to real estate and to personalty, i.e., 60% to the real estate portion and 40% to the personalty portion.[3]
Attorney Cellai knew that, since Kelly’s death, real estate taxes were accruing on 143 Bourne Avenue to the extent that a tax foreclosure was imminent. Because of this, Attorney Cellai and Kane, with the permission of the residuary legatee, entered into a stipulation whereby the estate would pay the real estate taxes due on 143 Bourne Avenue to avoid either a tax taking or a foreclosure, subject to an agreement that a determination would later be made as to whose obligation the taxes were. Pursuant to this agreement, the executor paid approximately $9,000.00 for the taxes due on that property.
Kane asserts that these tax payments were the obligation of Craft. Attorney Cellai claims that the taxes paid pursuant to this agreement are a cost of the estate administration because title to the real estate had not yet vested in the beneficiary. The title Craft took at the moment of Kelly’s death was subject to divestiture.
Attorney Cellai represented Craft from August 1993 until she terminated him by letter dated April 11, 1997. The four-page handwritten letter by Frances Craft appears thoughtful and reflects a decision-making process that had taken her several months. She expresses disappointment in the legal process and, to some extent, disappointment in her personal counsel. She writes,
Your call to me yesterday concerning the appointment with the New York City doctor made me realize that a decision that has been brewing in my mind for several months must be made. I have thought things over very carefully and have come to understand many tilings. The most important fact that four (4) years have gone by and all legal actions taken so far have not been about me at all. I see many lawyers involved, all making money, all of you seem to have forgotten that there were two (2) victims in this matter Bill and me! The house that Bill wanted me to have as a home doesn’t really belong to me. And now you tell me that when it’s sold, so many people are in line to collect their share it will leave me with nothing. And if I don’t sue, I can’t live in it because of its condition. To me it seems that it’s a loss to me.
Secondly, I have been bullied for four years over this lawsuit and to me you have seemed to be more on the side of the insurance company than mine. You have challenged my truthfulness all along the way. You have failed to take action against the home health agency who allowed an employee to violate my privacy and to act as a witness against me, telling lies, for what motive I don’t know. You tell me you’re very worried about her testimony. It’s almost like you’re telling me you believe what she says and I am in the position of proving to my own lawyer that she is lying! This is ridiculous!
I can’t tolerate any of this anymore. For the reasons stated and others, I no longer wish you to act as my attorney. I feel you have not acted with my best interests in mind so that I can get on with my life.
Therefore, I formally ask you to cease and desist acting as my attorney. I am rescinding the power of attorney I signed. Any fees owed you I feel sure you can very swiftly get it from the estate by exercising the lien you took on the house.
I’m putting all matters in Mass, behind me and getting on with my life. I will be notifying Mr. Kane I’m giving up my interest in the house. The only thing I want is my personal belongings still at the house and to be left alone.
I expect no further telephone or written communication from you as you are no longer my attorney. I will notify the interested parties to communicate directly with me on any pending matters until I am able to obtain legal advise (sic) to close out any pending matters.
I am sorry to have to do this but I feel that when one loses trust in one’s attorney then it’s futile to continue the relationship. Please also understand I hold you to the attorney/client privilege as to any communications between you and me, verbal or written and I don’t expect that to be violated. I will notify all involved parties that you are no longer my attorney.
Sincerely,
Frances Craft
On an attached last page, she adds,
Please note:
I have made the decision to move from New York to start a new life. When that will occur I don’t know yet. But in the meantime I don’t expect to be bothered by phone calls or letters. They are too upsetting to me, and I must now concentrate on *46 making myself better and getting on with a new life. Just please leave me alone.
In a subsequent letter to the court, Frances Craft writes: “I am currently under medical and psychological care and I am unable to travel to Massachusetts at this time . . . (P)revious counsel has not provided me with any of the documents and records which I personally obtained for him. I therefore have to obtain new records again.” There is no claim that Craft discharged Attorney Cellai to recover the fruits of his labor without compensating him. Her reasons for terminating Attorney Cellai are based on her rational decision-making process concerning what is best for her, given all of her circumstances. I accept from Craft’s letter and other trial testimony that Craft was acting only in good faith when she terminated Attorney Cellai.
Attorney Cellai became a licensed Massachusetts attorney in 1991 and has always been in good standing as a member of the bar. He received a Master’s Degree in Economics from Boston University and a J .D. Degree from New England School of Law in 1991. In April 1992, Attorney Cellai began a general practice of law in Massachusetts concentrating in probate and personal injuiy matters, His initial hourly rate was approximately $125.00; by 1995 his hourly rate was approximately $150.00. In 2003, his hourly rate was approximately $175.00.1 accept that all of these rates are, and were at the time charged, reasonable hourly rates. Between 1992 and 1997, he tried three cases to a jury, one of which was a civil rights case and two of which were personal injuiy cases. Between 1992 and 1997, he had approximately five bench trials, most of which were personal injuiy cases in which he represented the plaintiff. He was referred this case by another attorney in 1993 and at that time, this was a major case with serious potential for Attorney Cellai.
Because this was a contingency fee case, Attorney Cellai did not keep contemporaneous time records, although the referring attorney did. I accept that, between 1993-1997, Attorney Cellai and others spent more than 388 hours working on this case. I accept that the 388 hours listed on Attorney Cellai’s affidavit are the hours that he and others worked that can be substantiated. I also accept that Attorney Cellai’s affidavit containing the number of hours worked and the description of work done is accurate and reasonable, given the novel nature and gravity of the claims as well as the zealousness of the prosecution and of the defense. I accept that they did this work, more than 388 hours, to best prepare this novel case for trial, notwithstanding that, as often happens in plaintiffs contingent fee cases, recoveiy is not assured. I accept that, given the novel nature of the claim and with two experienced defense counsel representing the decedent (one through his homeowner’s policy, and one being the Executor), there were numerous contentious issues, especially concerning discoveiy.
Attorney Cellai had no expectation of recovering the costs of the lawsuit which he incurred unless he made a recoveiy for his client. He knew he would not otherwise be successful in getting reimbursement from his impoverished client who lived in public housing. Throughout the time that he knew her, she was always in dire financial straits and given her history of emotional conditions and difficult physical problems, including with walking, he had no reason to believe that, but for a recoveiy on this lawsuit, her dire financial straits would ever improve substantially such that she would be in a position to reimburse him for the approximate $10,000.00 in costs that he incurred while prosecuting this case. Attorney Cellai incurred costs of approximately $10,000.00 including deposition and investigation costs, and expert fees for the medical consultant and for experts as to the cause of the fire and rebuilding the house. I also accept that Attorney Cellai retained an expert physician in New York to testify concerning the emotional and psychological injuries Craft sustained as a result of the fire and that he made a commitment to pay that expert $2,800.00 which he had to pay himself after Craft discharged him. I accept that Attorney Cellai made that payment prior to receiving Craft’s termination letter, then put a stop payment on it after he had received her letter, then finally made the payment after the physician threatened to complain to the BBO.
Attorney Cellai filed both his motion to withdraw and his Notice of Attorney’s Lien in April 1997. In June 1997, after Attorney Cellai’s motion to withdraw his appearance was allowed, Craft was contacted by letter by Kane as well as by defense counsel, Roiy Melvin. Eventually, the lawsuit Craft had filed against Kelly’s estate was settled for $7,500.00, the draft for which was made payable to her and other lien holders, including Attorney Cellai. To date that check has not been cashed, but was instead, for reasons that are unclear, sent by Craft to Attorney Cellai who sent it to the clerk’s office.
While Attorney Cellai represented Craft, she was free to, and did, convey the real estate she inherited from Kelly. The estate had no right to the proceeds of that sale and the estate was not a party to that conveyance.
On or about December 22, 1997, Kane disbursed the remainder of the estate proceeds to Louizos by means of a check in the amount of $65,000.00. He did so at his peril, not only because of the 1994 court order establishing that he held in constructive trust for Craft the real estate portion of the insurance proceeds, but also because he had notice of Attorney Cellai’s lien.

RULINGS OF LAW

Section 50 of Chapter 221 of the General Laws of Massachusetts provides that, starting from the time an action commences, an attorney representing a client with respect to that action “shall have a lien upon his client’s cause of action . . . upon the judg *47 ment, decree or other order in his client’s favor entered or made in such proceeding.” Attorney Cellai holds such a lien, called a “charging lien,” which Attorney Cellai claims against the fire insurance proceeds and the settlement proceeds. Craft, 51 Mass.App.Ct. at 651 n.7. Attorney Cellai’s lien arose on the commencement of the plaintiffs suit against the defendant. Id. at 651. That lien remained inchoate until 1994 when this court (Donovan, J.) allowed the plaintiffs motion for partial summary judgment [2 Mass. L. Rptr. 395]. Id. at 649, 651. “The interlocutory order of the first judge was an order in Cellai’s client’s favor, [therefore] . . . Cellai’s inchoate lien . . . became choate, or matured, at the time of the order.” Id. at 651; see Cohen v. Lindsey, 38 Mass.App.Ct. 1, 4 (1995) (holding that “the sweep of the statute [G.L.c. 221, §50,] now includes any type of court order obtained in a client’s favor”). That order provided that the executor held the fire insurance proceeds in a constructive trust for Craft’s benefit to the extent those proceeds represented damage to the real estate. Attorney Cellai’s lien therefore attached to the money due to Craft under the constructive trust for damages to the real estate, which I have found was $26,115.97.
After Attorney Cellai’s withdrawal and after he filed his lien, the parties disposed of this case by stipulation of dismissal. Craft, 51 Mass.App.Ct. at 652. This “stipulation of dismissal constituted a judgment within the meaning of the attorney’s lien statute [G.L.c. 221, §50].” Id. at 653 (citation omitted). The settlement proceeds totaled $7,500.00.[4] Id. “Cellai’s lien arose prior to the settlement, [therefore] the lien attached to the $7,500.00 arising under the stipulation of dismissal . . .” Id. The lien attached to this amount in addition to the amount held by the executor in constructive trust for Craft.
In remanding this case to the Superior Court, the Appeals Court asked, in part, that the court make “a thorough exploration of [whether the plaintiff discharged Attorney Cellai in bad faith or for good cause] and other matters identified as relevant in Salem Realty [Co. v. Matera].” Id., citing 384 Mass. 803, 804 (1981).[5] Those matters identified in Salem Realty Co. relate to a hypothetical situation where the court finds that the client unilaterally terminated his contract with the attorney in bad faith. 384 Mass, at 804. In that instance, the SJC cautioned that the attorney’s recovery on the contingent fee agreement, rather than in quantum meruit, might be proper because the court would treat the contract as enforceable. Id. “Recovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute.” Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 250 (1993). The SJC affirmed the lower court’s finding that the plaintiff had terminated its contract with its attorney without bad faith, thereby triggering quantum meruit analysis. Id.
In leaving open the question of how to determine an attorney’s recovery when his client terminated him in bad faith, the SJC set forth factors “which may be weighed on another day when [the court is] called upon to espouse or reject a rule permitting recovery on a contingent fee agreement . . .” Id. Those factors include “the bad faith of the pariy terminating [the contract], the extent of the performance left incomplete, the cost to the client of legal services necessary to complete the work, the conduct of the attorney in performing the agreement, and the wording of the agreement.” Id. (internal citation omitted).
Bad faith “is a general and somewhat indefinite term. It has no constricted meaning. It cannot be defined with exactness. It is not simply bad judgment. It is not merely negligence. It imports a dishonest purpose or some moral obliquity. It implies conscious doing of wrong. It means a breach of a known duty through some motive of interest or ill will. It partakes of the nature of fraud[.]” Ramos v. Board of Selectmen of Nantucket, 16 Mass.App.Ct. 308, 314 (1983), quoting Spiegel v. Beacon Participations, Inc., 297 Mass. 398, 416-17 (1937). Conversely, good faith is a “state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one’s duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage.” Black’s Law Dictionary 701 (7th ed. 1999).
In this case, the parties have failed to present a scintilla of evidence establishing that the plaintiff discharged Attorney Cellai in bad faith. Rather, the record contains evidence indicating a breakdown of the attorney-client relationship between Attorney Cellai and the plaintiff. In Phelps Steel Inc. v. Von Deak, the question before the court was whether the plaintiffs attorneys had withdrawn in good faith. 24 Mass.App.Ct. 592, 594 (1987). There, the relationship between the plaintiff and its attorneys “soured during the plaintiffs contract dispute with the defendant.” Id. at 593. Eventually, the plaintiffs attorneys were “placed in a position where [they were] bound to withdraw, i.e., [they were] pushed [into withdrawing].” Id.
“The lawyer-client relationship is founded on trust and confidentiality. When those foundations deteriorate, it is not only impractical to persist in the relationship, it diminishes the integrity of the bar to do so.” Id. at 594. Consequently, the court in Phelps Steel Co. held that the “[breakdown of the lawyer-client relationship servefd] as good cause for [the attorneys’] withdrawal...” Id. Here, the record supports a finding that the plaintiff discharged Attorney Cellai in good faith. Upon the plaintiffs discharge of Attorney Cellai, their contract terminated; therefore quantum meruit is the appropriate *48 method by which the court may determine the amount of Attorney Cellai’s lien. See id.
“In applying a quantum meruit standard [to the calculation of an attorney’s lien,] . . . the discharged attorney is entitled to consideration not only of the services rendered, but also the contribution of those services to the ultimate result achieved.” Salem Realty Co. v. Matera, 10 Mass.App.Ct. 571, 576 (1980). Among the other factors a court may consider “are the customaiy ones applicable in measuring a legal fee: the special skills which may have been brought to bear, the complexity of the case, the size of the case in terms of dollars, the caliber of the services, the fees usually charged for work of the kind involved, the time spent, and the success achieved.” Id. (citations omitted); see Phelps Steel, Inc., 24 Mass.App.Ct. at 595, citing Mulhern v. Roach, 398 Mass. 18, 24-25 (1986).
These considerations in this case, however, are unnecessary because the amount Attorney Cellai would be due if the court applied a quantum meruit theory exceeds the amount to which his lien entitles him. Attorney Cellai, and others on his behalf, spent more than 388 hours working on Craft’s case. During the time period he worked on the case, his rate ranged from $125.00 to $150.00 per hour; for an average of $137.50 per hour. Attorney Cellai’s fee is therefore approximately $53,350.00, plus the approximately $10,000.00 in costs that he incurred. I find that Attorney Cellai is entitled to the full amount due to the plaintiff because Attorney Cellai’s recovery pursuant to his lien is capped by Craft’s recoveiy. See Collins v. Town of Webster, 25 Mass.App.Ct. 745, 749 (1988) (holding, “attorney’s lien may be enforced only to the extent of the judgment in favor of the client”).
In 1994, the court (Donovan, J.) entered an order that Kelly’s executor held the real estate proceeds from Kelly’s insurance policy in a constructive trust [2 Mass. L. Rptr. 395]. The amount the insurance carrier paid to Kelly’s estate pursuant to his insurance policy was $43,732.38 for fire damage. Of that total amount, $26,115.97, or 60%, represented damage to the real estate, and $17,616.41, or 40%, represented damage to the personalty. Both Craft, as a specific legatee, and Louizos, as a residuary legatee, are responsible for Panakio’s $4,378.24 payment because Panakio’s work helped determine the amount claimed and ultimately paid by the insurer for fire damage. Sixty percent of $4,378.24, or $2,626.94, is the amount to be deducted from the $26,115.97 due to Craft, for a total of $23,489.03. Only Craft, however, is responsible for the $9,000.00 in outstanding real estate taxes on the real estate she inherited from Kelly. “[T]itle to real estate owned by the decedent passes ... by devise to the devisees when the person dies testate. Therefore, the executor. . . should not use estate funds to pay any expenses in connection with the real estate unless he is to obtain a license to sell the property for payment of debts and expenses . . .”21 Sean M. Dunphy, Massachusetts Practice, Probate Law and Practice, §32.1 (2nd ed. 1997) (emphasis added).[6]
Consequently, the total due to Craft from the constructive trust is $14,489.03, and Attorney Cellai’s lien attaches to that full amount. His lien also attaches to the $7,500.00 in settlement proceeds, for a total lien of $21,989.03. Accordingly, Attorney Cellai is due $21,989.03 plus interest from December 22,1997, the date on which Kane breached the 1994 court order by disbursing the estate proceeds to Louizos.[7] See G.L.c. 231, §6C (providing, “[i]n all actions based on contractual obligations, upon a verdict, finding or order for judgment, interest shall be added by the clerk of the court to the amount of damages ... at the rate of twelve per cent per annum from the date of the breach . . .”).

ORDER

For the foregoing reasons, Attorney Cellai’s attorney’s lien is enforced in the amount of $21,989.03 plus interest from December 22, 1997.

.I accept that the speed and purpose with which Attorney Cellai filed this motion only a period of months after he filed the lawsuit is substantial evidence of the efforts he extended for his client, notwithstanding the novel nature of the claim and the uncertainty of any recovery.

For reasons which are unclear, on the tax return Kane listed the fire insurance proceeds (realty and personalty) as $39,404.13. This amount is not the net proceeds after Panakio’s deduction.

$26,115.97 divided by $43,732.38 is 0.59717697, or approximately 60%. $17,616.41 divided by $43,732.38 is 0.40282303, or approximately 40%.

The Appeals Court noted that the record was unclear as to whether the defendant actually paid the $7,500.00 to the plaintiff. Id. I find that to date, that check has not been cashed.

Salem Realty Co. is a rescript opinion of the Supreme Judicial Court.

This court’s research has not uncovered any reason why the fact that Craft’s title to the real estate was subject to divestiture should alter this outcome. See Black’s Law Dictionary 491 (7th ed. 1999) (defining divestiture as “[a] court order to a party to dispose of assets or property”).

Attorney Cellai has requested that the date from which interest is due is October 14, 1993, the date he filed Craft’s action against Kane. Attorney Cellai’s lien, however, was not even choate on that date. Attorney Cellai also requests that the estate pay to him the $7,500.00 in settlement proceeds from the Massachusetts Insurers’ Insolvency Fund, with interest on that amount from October 1997, when the settlement check was issued. As to the former request, Kane has not addressed the issue of the Massachusetts Insurers’ Insolvency Fund, thus this court will not address it either. As to the latter request, Attorney Cellai sent the $7,500.00 settlement check to the clerk’s office after receiving it from Craft, therefore the estate should not be responsible for interest between October 1997 and December 22, 1997.