Cady *v.* Marcella.

A. MICHAEL CADY & another[1] *vs.* RONALD MARCELLA & another.[2]

No. 97-P-91.

Berkshire. December 14, 1999. - June 7, 2000.

Present: JACOBS, PORADA, & GREENBERG, JJ.

*Contract,* Construction of contract, Interference with contractual relations. *Sale,* Contract of sale. *Civil Rights,* Immunity of public official. *Emotional Distress. Negligence,* Emotional distress. *Abuse of Process. Consumer Protection Act,* Trade or commerce. *Words,* "Buyer."

The written terms of a contract specifying that title to a modular home passed to the "buyer" upon delivery and payment in full were not ambiguous with respect to "customers" who ordered, took delivery, and paid for the unit; as a consequence, a sheriff unlawfully seized a portion of the buyers' unit pursuant to a valid execution on a judgment against a third-party construction company who had no title to the property, and a judge should not have allowed motions for directed verdicts in favor of the defendant sheriff and judgment creditor on the buyers' claims for abuse of process, interference with contractual relations, intentional infliction of emotional distress, and violations of G. L. c. 93A and 42 U.S.C. § 1983. [337-338]

The enforcement of an execution on a judgment is a ministerial rather than a discretionary act of a sheriff, and a sheriff who levied on property that did not belong to the debtor had no absolute or qualified immunity under Federal law or qualified immunity under State law for his actions. [339-340]

Where plaintiffs' evidence in a civil action made out their claims for intentional infliction of emotional distress [340-341], abuse of process [341-342], and intentional interference with contractual relations [342-343], the judge erred in directing verdicts for the defendants: the claims should have gone to the jury.

Where plaintiffs in a civil action did not demonstrate any conduct of trade or commerce between them and the defendants, their claim under G. L. c. 93A was properly dismissed. [343]

CIVIL ACTION commenced in the Superior Court Department on July 20, 1992.

[1]Laurie A. Cady.

[2]L.P. Adams Co., Inc.

The case was tried before *Daniel A. Ford*, J., and motions for directed verdicts were heard by him.

*Alma R. Arlos* for the plaintiffs.

*Thomas J. Hamel* for L.P. Adams Co., Inc.

*Patrick J. Costello* for Ronald Marcella.

GREENBERG, J. Vincent Carchedi, doing business under the name of Pegasus Construction Co., Inc. (Pegasus), agreed to prepare a lot in Dalton owned by A. Michael Cady and his spouse, Laurie A. Cady, for the erection of a modular home. Penn Lyon Homes, Inc. (Penn Lyon), was to supply the modular home pursuant to a separate written contract. The enterprise ultimately failed when Deputy Sheriff Ronald Marcella seized one-half of the modular home to satisfy a judgment that L.P. Adams Co., Inc. (Adams), had obtained against Pegasus. Unfortunately for the Cadys, the other half of the modular home had just been placed on their foundation. Since they had paid the Penn Lyon delivery driver for the whole, they logically concluded that the half seized by Marcella belonged to them.

The Cadys brought an action against Adams and Marcella for intentional infliction of emotional distress, abuse of process, interference with contractual relations, and violation of G. L. c. 93A, the Massachusetts consumer protection law. There was an additional civil rights claim pursuant to 42 U.S.C. § 1983 (1994)[3] against Marcella. The case was tried to a jury in the Superior Court. After the close of the Cadys' evidence, the judge allowed motions for directed verdicts in favor of Adams and Marcella on all counts, ruling that the seized unit had belonged to Pegasus and not the Cadys. The Cadys appeal.[4] The counts alleging violations of c. 93A were properly dismissed.

---

[3] In relevant part, the statute reads: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[4] Counts for conversion against both defendants were dropped at trial and therefore are not before us. In addition, claims against two other parties were dismissed or settled, such that those parties are not before us. Finally, directed verdicts were granted in favor of both defendants on counts of trespass. The Cadys do not argue against that decision in this appeal, and therefore we do not address that portion of the judgment. See, e.g., *Dullea* v. *Safety Ins. Co.*, 424 Mass. 37, 38 n.2 (1997); *Perseus of N.E., MA, Inc.* v. *Commonwealth*, 429 Mass. 163, 166 n.3 (1999).

We conclude, however, that it was error to direct a verdict on each of the remaining counts.

We state the evidence before the jury which was most favorable to the Cadys. In 1989, the Cadys decided to buy a modular home and contacted Carchedi. Carchedi was an authorized builder for Penn Lyon, and accordingly showed Laurie Cady brochures of the different home styles Penn Lyon manufactured, as well as Penn Lyon carpet, trim, and cabinet samples. Cady settled on a home style, and she and Carchedi together filled out a Penn Lyon order form entitled "Sales Agreement," specifying the model, size, and features that the Cadys wanted in their home. The prices charged for each of these options was filled in by a Penn Lyon employee, not by Carchedi. While the terms and conditions on the back of the form repeatedly refer to "Buyer," nothing on the form designates anyone as the buyer. Instead, the form identifies a "Salesman" (Greg Remphrey), "Builder" (Pegasus), "Customer" (Cady), and "Contact" (Carchedi).

In a separate agreement, the Cadys and Carchedi, now doing business under the name of Stonebridge Realty Trust,[5] agreed to "the construction of a Penn-Lyon Modular home as a turn-key project." The contract provided that Carchedi's construction business was to "provide foundation, excavation, backfill, rough grade, drainage, water & sewer installation, complete button-up of interior and exterior of house, complete plumbing, heating, and electrical." In return, the Cadys agreed to pay a deposit up front "to cover ordering of house and subcontractor deposits," and then various sums upon completion of the foundation and backfill/utilities, delivery of the house, and completion of the contract. Cady gave Carchedi a check for the initial deposit totaling $13,135, and Carchedi gave Penn Lyon a check for the $2,000 deposit Penn Lyon required for the home order.

All went according to plan, and the Penn Lyon delivery driver arrived at the Cadys' lot on January 5, 1990. Under the Penn Lyon sales agreement, delivery is complete when the units arrive on the truck at the designated point of delivery, and title passes to the buyer upon payment in full. There is no dispute that Penn Lyon delivered the units. Nor is there dispute that Cady handed the driver a bank check drawn on the Cadys'

---

[5]Carchedi testified at trial that he used two different businesses "to separate the sales from the actual construction part of it."

mortgage account in full payment for the house. All parties, therefore, agree that the "buyer" owned the units at this point.

The reader will recall that the first half of the house was placed on the foundation without incident, but before the second half could join its mate, Deputy Sheriff Marcella arrived. He announced that he was seizing the second half of the house pursuant to a valid execution on a judgment against Pegasus. He spoke with the delivery driver, verifying that the units had been paid for[6] and noting that the invoice showed "Sold to: Pegasus." Cady protested that she had paid for both units, they were on her property, and they were hers. Supporting her claim of ownership was the bank check, which reads "Ref: Cady" in the corner, and her signature of acceptance on the invoice. Negating her claim was the box on the invoice which reads "Sold to: Pegasus."

Marcella put his arm around Cady and said, "Oh, honey, you don't understand how these things work, I do. You don't own it until it's sitting on the foundation, don't worry about it, you'll have it back later this afternoon. We just want to get some money due us." Marcella then instructed the Penn Lyon driver to take the unit to Adams's place of business. It was not returned later that afternoon; in fact, twelve days passed before it was returned to the Cadys' homesite, by which time, as one might imagine, the construction crew had gone home, leaving the Cadys with yet another delay until the work could be rescheduled.

1. *Title.* The primary issue before us is whether on January 5, 1990, title to the half of the home which had not been installed on the foundation nonetheless did pass to the Cadys. If it did, then Marcella, on behalf of Adams, wrongfully seized the Cadys' property to satisfy Pegasus's debt. As the trial judge noted, if that is the case, then the jury could find intentional infliction of emotional distress, abuse of process, interference with contractual relations, and a violation of the civil rights act.

When, as here, parties reduce the terms of their agreement to a written contract, any conflict as to the meaning and applicability of terms is a question of law. See *USM Corp.* v. *Arthur D. Little Sys., Inc.,* 28 Mass. App. Ct. 108, 116 (1989). Therefore, whether title passed to the Cadys under the agreement is a ques-

---

[6]On a prior occasion, Marcella's efforts to execute this same judgment against Pegasus had been foiled when he tried to seize a modular home that had not yet been paid for and therefore still belonged to Penn Lyon.

tion for the court, since it requires interpretation of the contract rather than resolution of disputed facts. See *Ober* v. *National Cas. Co.*, 318 Mass. 27, 30 (1945). In interpreting contracts, "words that are plain and free from ambiguity must be construed in their usual and ordinary sense." *Ibid.* The contract must be construed "as a whole, in a reasonable and practical way, consistent with its language, background, and purpose." *USM Corp.* v. *Arthur D. Little Sys., Inc., supra.*

Any extrinsic evidence on this point is barred by the merger clause of the agreement, which states that "[t]his writing is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms thereof. No course of prior dealings between the parties and no usage of trade shall be relevant or admissible to supplement, explain, or vary any of the terms of this Agreement." Even in the absence of such a clause, where the written terms of the contract are not ambiguous on their face, extrinsic evidence is not admissible to contradict them. See *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 754 (1973).

The contract specifies that title passes to the "Buyer" upon delivery and payment in full. It does not, however, identify the "Buyer." Instead, it identifies a "Salesman," "Builder," "Customer," and "Contact." This is not ambiguous: Neither "salesman," nor "builder," nor "contact" is synonymous with "buyer"; but a customer is a "buyer," both in ordinary use of the word, and as a term of art in the law. Black's Law Dictionary 386 (6th ed. 1990).

The reasonable and practical reading of the Penn Lyon sales agreement is that the Cadys were the buyers, and therefore, owned the unit when it was seized by Marcella. The trial judge found that if the Cadys were the owners, then there was sufficient evidence on the elements of their claims to deny the motions for directed verdicts. The Cadys were the owners. Those motions should have been denied.[7]

---

[7]The Cadys also appeal the trial court's incorporating into its findings the rulings of an earlier case between Penn Lyon and Adams in which the court determined that Pegasus was the owner of the unit at issue here. The Cadys were not parties to that case, and argue that, since they did not have any opportunity to litigate that fact, they cannot be bound by it. Because we determine that the Cadys were the owners, we need not address whether the trial court erroneously imported a factual finding or instead simply referred to a chain of reasoning it had found persuasive before.

2. *Marcella's claim of immunity.*[8] Marcella proposes that the directed verdict in his favor for the § 1983 claim should be affirmed on the ground of either absolute or qualified immunity under Federal law, and that directed verdicts in his favor on the State tort claims should be affirmed on the ground of qualified immunity under State law. However, immunity in any of these forms is available only to officials performing discretionary, rather than ministerial, acts. See, e.g., *Antoine* v. *Byers & Anderson, Inc.,* 508 U.S. 429 (1993) (refusing absolute immunity under Federal law where job did not involve discretionary judgment); *Breault* v. *Chairman of the Fire Commrs. of Springfield,* 401 Mass. 26, 33 (1987) (refusing qualified immunity under Federal and State law), cert. denied sub nom. *Forastiere* v. *Breault,* 485 U.S. 906 (1988). Determining whether an act is discretionary or ministerial is a question of law for the court. See *Breault* v. *Chairman of the Fire Commrs. of Springfield, supra* at 32. An act is discretionary when it "fails to specify the precise action that the official must take in each instance." *Id.* at 34 n.8, quoting from *Davis* v. *Scherer,* 468 U.S. 183, 196 n.14 (1984).

Enforcing an execution on a judgment is a ministerial, rather than a discretionary, act. The creditor or, as here, the creditor's attorney, provides the deputy sheriff with the writ of execution and instructions to levy on a particular piece of property. The precise action the officer must take is specified: he is commanded by the writ to enforce the execution provided to him and instructed by the creditor as to which piece of property to seize. Hence, that action is purely ministerial.[9] Compare *Koonce* v. *Aldo Realty Trust,* 8 Mass. App. Ct. 199, 201 (1979) (once execution placed in his hands, it is constable's duty to remove

---

[8]Marcella raises immunity with respect to the Federal § 1983 claim and the State tort claims. Therefore, we discuss the standards for immunity under both Federal and State law.

[9]General Laws c. 235, § 35, is not to the contrary. It reads: "If there is reasonable doubt as to the ownership of personal property . . . the officer may require sufficient security from the creditor to indemnify him for taking or continuing to hold the same. If sufficient security is not furnished within a reasonable time after the officer has made a written demand upon the creditor or his attorney, the officer may refuse to levy the execution . . . without liability to the creditor therefor."

The very existence of this statute demonstrates that officers may be held liable for taking the property of someone not named in the writ and provides officers with an opportunity to insulate themselves from that unpleasant prospect. Whether or not an officer avails himself of this protection, once he

and sell such of debtor's possessions as necessary to satisfy the execution).

In addition, "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. . . . We have been quite sparing in our recognition of absolute immunity, and have refused to extend it any further than its justification would warrant." *Antoine* v. *Byers & Anderson, Inc.*, 508 U.S. at 432 n.4, quoting from *Burns* v. *Reed*, 500 U.S. 478, 486-487 (1991). Marcella has failed to carry this burden. The cases cited in his brief[10] do provide absolute immunity to sheriffs and similar officers, but in circumstances materially different from the case before us. In the cases Marcella cites, plaintiffs complained of judges' orders, naming as defendants officers who merely had carried out those judges' orders accurately. In the interests of fairness, those officers were found to be cloaked with the same judicial immunity as the judges whose orders they carried out. See note 10, *supra*. In the case before us, on the other hand, the judge's order to seize Pegasus's property is not contested; it is Marcella's seizure of the Cadys' property instead that is at issue. Marcella's appeal for immunity must fail.

3. *Sufficiency of the evidence.* The defendants next argue that the directed verdicts as to the State tort actions should be affirmed in any event, because the Cadys failed to present sufficient evidence to allow those claims to go to the jury. We address each claim in turn.

a. *Intentional infliction of emotional distress.* "To sustain a claim of intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress. To be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and . . . utterly intolerable in a civilized community. Liability cannot be founded upon

undertakes to enforce an execution in the manner specified, he is to follow that direction. This is the essence of a ministerial act.

[10]See *Slotnick* v. *Garfinkle*, 632 F.2d 163, 166 (1st Cir. 1980); *Henry* v. *Farmer City State Bank*, 808 F.2d 1228, 1239 (7th Cir. 1986); *Valdez* v. *City & County of Denver*, 878 F.2d 1285 (10th Cir. 1989); *Roland* v. *Phillips*, 19 F.3d 552 (11th Cir. 1994); *Mays* v. *Sudderth*, 97 F.3d 107 (5th Cir. 1996).

mere insults, threats, or annoyances." *Sena* v. *Commonwealth,* 417 Mass. 250, 263-264 (1994) (internal citations and quotations omitted). Severe distress need not be accompanied by physical manifestations. See *Nancy P.* v. *D'Amato,* 401 Mass. 516, 520 (1988).

Adams's president admitted in his testimony that he "had every reason to believe that somebody that had their house taken was going to wind up emotionally upset," and a jury could properly find that Marcella knew or should have known the same. Certainly a jury could find that seizing half of the Cadys' house to satisfy Pegasus's debt, leaving the Cadys with one-half of a house on their foundation for twelve days in the middle of winter, was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

Finally, there was evidence from which a jury might determine that the defendants caused the Cadys' distress, and that their distress was severe. Adams claims that expert medical testimony is required to recover for emotional distress, citing *Ramos* v. *Selectmen of Nantucket,* 16 Mass. App. Ct. 308 (1983). *Ramos* does not support this proposition. In *Ramos,* there was no evidence of causation between an act or omission of the defendants and any mental distress of the plaintiff. The court there indicated that while perhaps a medical expert would have been able to connect the dots, in the absence of such an expert, "it would be wholly speculative to award damages to Ramos for mental distress." *Id.* at 319. In the case before us, the record itself speaks of the severe emotional distress caused by the wrongful attachment of the Cadys' property. A jury could find that being left with half of a house unfinished on a building lot reasonably caused the hysterical crying, feelings of failure and humiliation (based on the knowledge that, when the story hit the newspaper and television, people first thought that the Cadys were the ones who had not paid their bills), headaches, upset stomachs, and inability to concentrate at work described by both of the Cadys. No medical expert is needed to explain to a jury that the two are causally connected.

The elements of this cause of action were made out in the plaintiffs' case, and the judge should have permitted the case to go to the jury.

b. *Abuse of process.* A jury could find that the defendants' subsequent misuse of process, even though properly obtained

against Pegasus, constitutes the misconduct for which liability may be imposed. See *Quaranto* v. *Silverman*, 345 Mass. 423, 426 (1963). To sustain a claim of abuse of process, "it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed." *Beecy* v. *Pucciarelli*, 387 Mass. 589, 595-596 (1982), quoting from *Quaranto* v. *Silverman, supra. Ladd* v. *Polidoro*, 424 Mass. 196, 198 (1997).

The Cadys argue that Adams and Marcella did harbor an ulterior purpose. The mere fact of having seized the wrong party's property is not sufficient to support that claim. See *Shaw* v. *Fulton*, 266 Mass. 189, 191-192 (1929); *Beecy* v. *Pucciarelli, supra*. In this case, however, there is more. The item here seized was half of a manufactured home — a difficult thing, the plaintiffs argue, to sell at auction. In light of this asserted lack of a market for half of a house, a jury could find that the defendants were using the execution impermissibly as "an instrument of persuasion rather than a means of satisfaction." *Koonce* v. *Aldo Realty Trust*, 8 Mass. App. Ct. at 201.

The fact that this ulterior motive was directed at Pegasus and not at the Cadys does not change the analysis. See *Shaw* v. *Fulton, supra* (indicating that abuse of process would have been supported had there been an ulterior motive as to either the plaintiff or the actual debtor). It would be manifestly unfair to allow recovery where the defendants had an ulterior motive, but deny recovery where, in addition to ulterior motive, the defendants also proceeded against the wrong party after having been informed of their error.

The trial judge incorrectly directed a verdict for the defendants on this issue.

c. *Interference with contractual relations.* "In an action for intentional interference with contractual relations, the plaintiff must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991). The defendants argue that a directed verdict on this issue was appropriate because the Cadys presented no evidence of an improper motive or means. However, there was evidence

on which a jury could find abuse of process, and abuse of process is an improper means. This claim, too, should have been permitted to go to the jury.

d. *Consumer Protection Act claim.* General Laws c. 93A declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." G. L. c. 93A, § 2(*a*). While the Cadys justifiably feel that the seizure of half of their house to satisfy another's debt was unfair, this statute remains unavailable: There was no conduct of trade or commerce between the Cadys and Adams or Marcella. See *Arthur D. Little, Inc.* v. *East Cambridge Sav. Bank*, 35 Mass. App. Ct. 734, 743 (1994) ("[T]he acts complained of did not occur while the parties were engaged in the conduct of trade or commerce. . . . No commercial relationship ever existed between the parties; their only contact occurred in the context of this litigation"). This claim was properly dismissed.

That portion of the judgment dismissing the claims for violation of c. 93A is affirmed. The portion of the judgment dismissing the claims for intentional infliction of emotional distress, abuse of process, interference with contractual relations, and 42 U.S.C. § 1983 is vacated. The case is remanded to Superior Court for further proceedings consistent with this opinion.

*So ordered.*