# United States Court of Appeals
## For the First Circuit

No. 11-2037

SUSAN LASS,

Plaintiff, Appellant,

v.

BANK OF AMERICA, N.A., and BAC HOME LOANS SERVICING, L.P.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Boudin, Lipez, and Thompson, Circuit Judges.

Kai H. Richter, with whom E. Michelle Drake, Nichols Kaster, PLLP, Thomas W. Duffey, and Keane, Klein & Duffy were on brief, for appellant.
John C. Englander, with whom Matthew G. Lindenbaum, Dennis D'Angelo, and Goodwin Procter LLP were on brief, for appellees.

September 21, 2012

**LIPEZ**, **Circuit Judge**. Appellant Susan Lass is among a number of homeowners in multiple states claiming that their mortgage companies have wrongfully demanded an increase in flood insurance coverage to levels beyond the amounts required by their mortgages. In this case, unlike in the companion case we decide today, Kolbe v. Bank of America, N.A., No. 11-2030, the pertinent mortgage provision explicitly gives the lender discretion to prescribe the amount of flood insurance. We nonetheless conclude that the district court's dismissal of Lass's complaint must be vacated. A supplemental document given to Lass at her real estate closing, titled "Flood Insurance Notification," reasonably may be read to state that the mandatory amount of flood insurance imposed at that time would remain unchanged for the duration of the mortgage. Given the ambiguity as to the lender's authority to increase the coverage requirement, Lass is entitled to proceed with her breach of contract and related claims.

**I.**

The following facts are drawn from the allegations in the complaint. See Román-Oliveras v. P.R. Elec. Power Auth., 655 F.3d 43, 45 (1st Cir. 2011). Appellant Lass, a resident of Rehoboth, Massachusetts, obtained a mortgage loan in the amount of $40,000 in 1994 from Residential Mortgage Corporation. Paragraph 5 of the

mortgage agreement,[1] titled "Hazard or Property Insurance," states in pertinent part:

> Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. . . . If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with Paragraph 7.[2]

The amount of flood insurance required by the lender was specified in a separate document labeled "Flood Insurance Notification" ("the Notification"). It states, in part:

> [A]t the closing the property you are financing must be covered by flood insurance in the amount of the principle [sic] amount

---

[1] The mortgage agreement was executed on a standard form issued by the Federal Home Loan Mortgage Corporation (FHLMC or "Freddie Mac") and the Federal National Mortgage Association (FNMA or "Fannie Mae") for single-family mortgages in Massachusetts. These two entities are "government-sponsored enterprises" ("GSEs")overseen by the Department of Housing and Urban Development ("HUD").

[2] Paragraph 7 provides, in part:

If Borrower fails to perform the covenants and agreements contained in this Security Instrument[,] . . . then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property.

Paragraph 7 also states that any costs incurred by the lender under the paragraph "shall become additional debt of Borrower" secured by the mortgage.

financed, or the maximum amount available, whichever is less. This insurance will be mandatory until the loan is paid in full.

Federal law also required Lass to obtain flood insurance coverage because her property is located in a special flood hazard zone under the National Flood Insurance Act ("NFIA"). See 42 U.S.C. § 4012a(b)(1).[3] The statutory coverage requirement is framed in terms similar to the Notification. At the time of her closing, Lass was obliged to purchase an amount of insurance that tracked the lower of her principal balance or the maximum amount of insurance available to her under the federal flood insurance program ($250,000). Id.; see also id. § 4013(b)(2); 24 C.F.R. § 203.16a; 44 C.F.R. § 61.6.[4] Lass at all times maintained flood insurance at least equal to the full amount of her loan, $40,000. In 2007, she voluntarily increased her coverage to $100,000.

The rights to Lass's mortgage eventually were acquired by Bank of America ("the Bank"),[5] and shortly thereafter, in November

---

[3] Technically, the statute requires the lender to require the borrower to obtain the insurance. See 42 U.S.C. § 4012a(b)(1).

[4] The federal law requirement in fact decreases as the mortgage balance decreases, with the statute setting the minimum amount of insurance as the "outstanding" principal balance. There is no contention that Lass was required to satisfy the $250,000 "available coverage" prong, and we therefore do not further refer to that alternative in our discussion.

[5] The Bank initially assumed the role of lender and BAC Home Loans Servicing, L.P. assumed the role of servicer. The two entities merged in 2011, and we thus refer to them collectively as "the Bank."

-4-

2009, the Bank sent Lass a form letter stating that the amount of flood insurance on her property was inadequate and did not satisfy "the terms of [her] mortgage/deed of trust and/or Federal law." The letter stated that she needed an additional $145,086 in coverage, so that she would have flood insurance in the same amount as the hazard insurance that she had purchased, the latter amount ordinarily reflecting the replacement value of the improvements on the property. The letter stated that, if Lass did not obtain the increased insurance by early January 2010, the Bank would purchase it for her, perhaps through its affiliated entities and likely with less coverage despite a possibly higher cost than insurance she could buy herself. Lass contacted the Bank questioning the need for more insurance, given her low principal balance,[6] and was incorrectly told that the new coverage requirements were mandated by the Federal Emergency Management Agency ("FEMA").[7] The Bank sent a follow-up letter in mid-December, reiterating its intention to purchase the additional insurance if Lass failed to do so.

In January 2010, the Bank purchased the additional flood insurance on behalf of Lass, backdated to provide coverage as of November 1, 2009, and it later charged her escrow account $748.10

---

[6] By the time she filed this action, Lass's outstanding balance had decreased to less than $28,000. The Bank's demand that she increase her flood insurance by more than $145,000 would bring the amount of insurance to more than $245,000.

[7] FEMA recommends such coverage, but the mandatory coverage requirements are set lower by the NFIA. See Section II.A. infra.

-5-

for the premium. After notifying Lass in September 2010 that it intended to renew the policy, the Bank purchased coverage in November 2010 in the amount of $149,998, charging Lass's escrow account $779.94. That second policy was replaced in March 2011 with a third lender-placed policy in the amount of $139,988, resulting in a charge of $724.94 to Lass's escrow account. Lass claims that the Bank or one of its affiliates received a commission or "kickback" in connection with the latter two lender-placed policies. Also in March 2011, however, following a television news report about plaintiff's flood-insurance interactions with the Bank, the Bank posted refunds to Lass's escrow account for the cost of the first two lender-placed polices (also commonly known as "force-placed" policies).

In April 2011, Lass filed a putative class action complaint, later amended, alleging that the Bank had "unfairly, unjustly, and unlawfully" forced her and other borrowers to purchase excessive amounts of flood insurance and had improperly profited through "kickbacks, commissions, or 'other compensation'" paid in connection with the force-placed insurance. Am. Compl. ¶¶ 3, 4. Her amended complaint contained five separate causes of action, all of which the district court dismissed. The court concluded that the mortgage agreement unambiguously entitled the Bank to increase the required amount of flood insurance at its discretion and, largely based on that determination, held that none

of Lass's claims survived.  On appeal, Lass challenges the dismissal of four claims: breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and breach of fiduciary duty.[8]  She asserts that the mortgage and Notification, in combination, at least created an ambiguity concerning the Bank's authority to demand greater coverage and, consequently, none of the claims should have been resolved at the motion-to-dismiss stage.

## II.

We review a district court's decision on a motion to dismiss de novo. Román-Oliveras, 655 F.3d at 47.  In so doing, we accept the facts as set forth in the amended complaint and draw all reasonable inferences in the plaintiff's favor. Cunningham v. Nat'l City Bank, 588 F.3d 49, 51 (1st Cir. 2009).  We also may consider documents incorporated by reference in the complaint, including the mortgage agreement and the Notification at issue here, as well as matters appropriate for judicial notice. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008).

## A. Breach of Contract

Lass's breach-of-contract claim depends on whether the amount of flood insurance required at the time of the closing --

---

[8] Lass does not appeal the dismissal of her claim alleging violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2607(a), (b).

the amount of Lass's loan -- was subject to change by the lender. In arguing that the amount was fixed for the duration of the loan, Lass points to the statement in the Notification that the insurance required at the time of the closing "will be mandatory until the loan is paid in full." The Bank, however, relies on Paragraph 5's statement that flood insurance "shall be maintained in the amounts and for the periods that Lender requires" in arguing that it had the discretion to demand more insurance when, and if, it deemed such an increase to be appropriate. The Bank asserts that the Notification -- to the extent it is considered part of the mortgage "contract" -- merely states that Lass must maintain the statutory minimum amount of insurance for the duration of the loan, and does not promise that the Bank will never exercise its discretion to increase the insurance obligation. Lass's fallback position is that the documents are at least susceptible to both interpretations and, hence, ambiguous. The district court agreed with the Bank, concluding that "[t]he notification can easily be read in conjunction with the mortgage[,] which gives the lender the discretion to set the required amount of flood insurance."

Thus, as in Kolbe, the question before us is whether the district court correctly concluded that the plaintiff's mortgage agreement unambiguously gives the lender the discretion to demand an increase in flood insurance to an amount above the borrower's initial obligation. Whether a contract is ambiguous is a question

-8-

of law in Massachusetts.  Bukuras v. Mueller Group, LLC, 592 F.3d 255, 261-62 (1st Cir. 2010) (citing Basis Tech. Corp. v. Amazon.com, Inc., 878 N.E.2d 952, 958-59 (Mass. App. Ct. 2008)). Language is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one."  Gemini Investors Inc. v. AmeriPark, Inc., 643 F.3d 43, 52 (1st Cir. 2011) (quoting Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass. 1998)) (internal quotation mark omitted).  In considering whether a contract is ambiguous, we read the agreement "in a reasonable and practical way, consistent with its language, background, and purpose."  Bukuras, 592 F.3d at 262 (quoting Cady v. Marcella, 729 N.E.2d 1125, 1130 (Mass. App. Ct. 2000)).

Lass argues that the Notification is part of the contract and should be considered along with Paragraph 5.  The district court acknowledged that the supplemental document "appears to be part of the mortgage contract, similar to a rider, although it is not listed in the mortgage as an incorporated rider."  The Bank disagrees, asserting that the Notification should not be considered part of the mortgage because it does not expressly bind both parties and requires only the borrower's signature.  Moreover, the Bank argues that the Notification "cannot be used to create ambiguity in the interpretation of paragraph 5," noting that "when reading distinct but related documents that concern the same

-9-

transaction . . . [construing such documents as one contract] applies primarily in cases of uncertainty and cannot undo plain language which makes perfect sense in context." Appellee's Brief at 26-27 (quoting Happ v. Corning, Inc., 466 F.3d 41, 46 (1st Cir. 2006)).

The Bank's argument is unpersuasive. Paragraph 5 of the mortgage gives the lender the discretion to fix the amount of flood insurance, and the Notification was an essential part of the transaction because it represented the exercise of that discretion at the outset of the mortgage period. In effect, the Notification completed the contract between the parties by specifying that, by the time of the closing, Lass was obliged to obtain the amount of flood insurance required by federal law, and no more. We thus see no reason to depart from the well established principle that, when the circumstances are appropriate, "instruments deriving from a given transaction shall be read together." Gilmore v. Century Bank & Trust Co., 477 N.E.2d 1069, 1073 (Mass. App. Ct. 1985) (noting also that, in addition to "the formal factors that connect the two agreements, . . . we lay stress on the sense of the thing"); see also In re Olympic Mills Corp., 477 F.3d 1, 14 (1st Cir. 2007) (noting that, without evidence of a contrary intention, "instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one

-10-

contract or instrument" (quoting 11 Richard A. Lord, Williston on Contracts § 30:26 (4th ed. 1999))); Chase Commercial Corp. v. Owen, 588 N.E.2d 705, 707 (Mass. App. Ct. 1992) ("[I]f the three documents were in essence part of one transaction, they must be read together to effectuate the intention of the parties.").[9] Hence, our inquiry encompasses both the mortgage and the Notification.

We begin by rejecting Lass's argument that the mortgage form itself cannot reasonably be read to give the lender discretion to modify the flood insurance requirement during the life of the loan. Paragraph 5 refers to "the amounts" and "the periods" of coverage required by the lender, and the use of the plural form suggests the possibility of changing obligations over time.[10] Indeed, if Paragraph 5 constituted the entire agreement on flood insurance, the Bank would have a compelling argument that the

---

[9] We recognize that, unlike the Notification, the documents construed together in some cases were signed by both parties to the transaction. We do not understand the principle to be limited to such circumstances. Here, as the district court observed, the Notification was "similar to a rider," and, as we have explained, it follows from "the sense of the thing" to treat it as part of the mortgage agreement. Gilmore, 477 N.E.2d at 1073.

[10] Although the language in Paragraph 5 of Lass's contract is not as explicit as Paragraph 5 in the current version of the standard Fannie Mae/Freddie Mac single-family form for Massachusetts, which explicitly states that the lender's insurance requirement "can change during the term of the Loan," see Am. Compl. Exh. 3, ¶ 5, the language applicable here nonetheless suggests comparable discretion.

-11-

mortgage could only reasonably be interpreted to give it discretion to increase the insurance obligation during the life of the loan.

As we have observed, however, the Notification is a significant component of the analysis here. After setting out the specific amount of flood insurance the borrower must obtain, the Notification states that "[t]his insurance will be mandatory until the loan is paid in full." The Notification does not identify the specified amount as merely a mandatory minimum, and it says nothing about the lender's discretion to change the insurance amount at any point before "the loan is paid in full." We think it is plausible that the original lender chose -- in an exercise of the discretion afforded by Paragraph 5 -- to align Lass's flood insurance obligation with the level of coverage deemed adequate under federal law, and that it intended to make that amount the benchmark for the entire mortgage period. We thus conclude that the Notification may be reasonably construed to say that the specified amount is the amount of insurance Lass was required to maintain until she paid off her loan.

That construction is not, however, inevitable. As the Bank argues, the "until the loan is paid in full" portion of the Notification also may be reasonably understood as intended to highlight the duty under federal law to maintain an amount of insurance linked to the principal balance, regardless of the lender's exercise of its discretion under Paragraph 5 to set a

different, perhaps greater amount.  See 42 U.S.C. § 4012a(e)(1) (requiring lender to inform the borrower of federal flood insurance requirements).[11]  The fact that the mortgage holders preceding Bank of America did not vary from the federally mandated starting point does not necessarily signify that they believed they lacked the discretion to do so, and their decision to keep the amount constant would not divest the Bank of any discretion afforded by Paragraph 5.[12]

None of the parties' other arguments persuades us that the mortgage is only reasonably construed to allow -- or not to allow -- the increased coverage demanded by the Bank.  Lass points to the sentence in Paragraph 5 authorizing the lender to obtain insurance to protect "its rights" in the property, and argues that it is well established under Massachusetts law that a lender's

---

[11] Of course, as noted earlier, the NFIA requires flood insurance in the amount of the outstanding principal balance, so the amount of insurance mandated by law would have decreased as Lass paid down her loan.

[12] As in Kolbe, our dissenting colleague presents the Bank's interpretation of the mortgage language but fails to give due regard to the plaintiff's contrary perspective.  For example, we agree that it would be difficult to construe the mortgage language itself to bar an increase in the required amount of flood insurance.  The Notification, however, states that the flood insurance required at the closing -- which was in the amount of the loan -- "will be mandatory until the loan is paid in full."  The fact that the mortgage permits changes in the flood insurance obligation does not mean that the requirement can be changed at will once the parties have agreed to a fixed amount for the life of the loan.  The question here is whether the lender in fact agreed in the Notification to a fixed amount of coverage.

-13-

rights are limited to the amount of the outstanding debt. Regardless of Massachusetts law, however, Paragraph 5 allows the lender to obtain coverage "in accordance with Paragraph 7," which in turn gives the lender authority not only to protect its own rights but also "to protect the value of the Property."[13]

We are likewise unmoved by the Bank's assertion that limiting flood insurance coverage to the amount required at Lass's closing is unreasonable given that FEMA recommends insuring for the full replacement value of the property. See Fed. Emergency Mgmt. Agency, National Flood Insurance Program: Mandatory Purchase of Flood Insurance Guidelines 27-28 (2007), available at http://www.fema.gov/library/viewRecord.do?id=2954 (last visited Sept. 18, 2012). As we noted in Kolbe, though replacement-value coverage may be advisable, Congress in the NFIA appears to have incorporated the view that it also would be reasonable for mortgagees to require only an amount "equal to the outstanding principal balance of the loan," 42 U.S.C. § 4012a(b)(1). Cf. Hofstetter v. Chase Home Fin., LLC, 751 F. Supp. 2d 1116, 1127 n.3 (N.D. Cal. 2010) ("Simply because an agency recommends that lenders maintain a certain amount of flood insurance coverage does not mean

---

[13] To the extent the relationship between Paragraph 5's "Lender's rights in the Property" reference and Paragraph 7's right to protect the "value of the Property" is debatable, the uncertainty reinforces our conclusion that an ambiguity exists concerning the Bank's authority to increase the flood insurance requirement.

-14-

that lenders have <u>carte</u> <u>blanche</u> to do so without regard to the terms of their loan agreements with borrowers."). Moreover, as we also pointed out in <u>Kolbe</u>, some lenders may choose to set a fixed, minimum flood insurance requirement to make home ownership accessible to more people.

Finally, as in <u>Kolbe</u>, we decline at this stage of the case to apply the principle of <u>contra</u> <u>proferentem</u> to construe Lass's mortgage against the Bank as the "drafter" of the agreement. The mortgage itself is on the standard Fannie Mae/Freddie Mac form for single-family residences in Massachusetts, and the record does not reveal how much control -- if any -- lenders have over its terms, or whether the language is properly characterized as "prescribed by law." <u>See</u> Restatement (Second) of Contracts § 206 cmt. b ("The rule that language is interpreted against the party who chose it has no direct application to cases where the language is prescribed by law, as is sometimes true with respect to insurance policies, bills of lading and other standardized documents."); <u>see</u> <u>also</u> Julia Patterson Forrester, <u>Fannie Mae/Freddie Mac Uniform Mortgage Instruments: The Forgotten Benefit to Homeowners</u>, 72 Mo. L. Rev. 1077, 1085 (2007) ("<u>The Forgotten Benefit</u>") (stating that "Fannie Mae and Freddie Mac require that loans they purchase be documented on their forms").[14]  Nor has

---

[14] We note that the standard Fannie Mae/Freddie Mac form, which contains terms negotiated by consumer advocates, has been described as "exceptionally fair" to borrowers. <u>See</u> <u>The Forgotten Benefit</u>,

-15-

evidence been cited concerning the origin of the "Flood Insurance Notification."  The name and logo of the original lender appear at the top of the Notification document, but the name is typed onto a blank line in the body of the document in a manner consistent with a standardized form.  As in Kolbe, Lass may choose to raise contra proferentem, as appropriate, upon further development of the record.

We thus conclude that, taken together, the mortgage and the Notification are ambiguous as to the lender's authority to demand increased flood coverage on Lass's property.  The district court therefore erred by rejecting Lass's proposed construction of the mortgage as unreasonable, and her breach of contract claim must be reinstated.  Cf. Arnett v. Bank of America, N.A., No. 3:11-cv-01372-SI, 2012 WL 2848425, at **5-9 (D. Or. July 11, 2012) (denying motion for judgment on the pleadings based on ambiguity of similar language in mortgage and supplemental flood insurance document).

## B. Covenant of Good Faith and Fair Dealing

Lass alleges that multiple aspects of the Bank's conduct in demanding increased flood insurance breached the covenant of good faith and fair dealing that is implicit in every contract in Massachusetts.  See Uno Rests., Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004); Anthony's Pier Four, Inc.

---

72 Mo. L. Rev. at 1087; see also id. at 1085 ("The forms have been modified over the years, but they retain the consumer-friendly provisions negotiated in the early 1970s." (footnote omitted)).

v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991). "[T]he purpose of the implied covenant is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract and that when performing the obligations of the contract, the parties remain faithful to the intended and agreed expectations of the contract." FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009) (quoting Chokel v. Genzyme Corp., 867 N.E.2d 325, 329 (Mass. 2007)) (internal quotation marks omitted); see also Nile v. Nile, 734 N.E.2d 1153, 1160 (Mass. 2000). To succeed with a claim based on the implied covenant, the plaintiff must "present[] evidence of bad faith or an absence of good faith." T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 706 (Mass. 2010) (stating also that "no evidence of an improper motive . . . was presented at trial, and no facts presented at trial support a finding of an absence of good faith"); see also Uno Rests., 805 N.E.2d at 964 n.5; Nile, 734 N.E.2d at 1160 (stating that a lack of good faith "may be inferred by evidence that the [conduct] was unreasonable under all the circumstances"). Evidence that the defendant acted "to gain an advantage for itself" can support a claim for breach of the covenant. See T.W. Nickerson, 924 N.E.2d at 707.

Lass's complaint advances seven grounds for the implied covenant claim, among them the Bank's demanding more flood insurance than required by federal law or the mortgage agreement,

-17-

its purchase at Lass's expense of backdated insurance, and charging borrowers for commissions or "other compensation" for itself or its affiliates. See Am. Compl., ¶ 75. In keeping with our analysis in Kolbe, we conclude that these allegations of "unfair[], unjust[], and unlawful[]" conduct are sufficient to state a claim for violation of the covenant of good faith and fair dealing. See Am. Compl., ¶¶ 3, 4. If the Bank demanded flood insurance coverage that exceeded the requirements of federal law and the mortgage for the purpose of increasing profits for itself or its affiliates, or if it unjustifiably charged borrowers for backdated coverage and commissions, its conduct would be at odds with "the intended and agreed expectations of the contract," FAMM Steel, 571 F.3d at 100 (internal quotation mark omitted).[15]

The Bank argues that Lass's allegations are merely conclusory assertions that fail to establish a plausible claim for relief. See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). To the contrary, Lass points to specific facts that, once developed with the aid of discovery, could support the implied covenant claim: the Bank warned in its notice letters that

---

[15] Although the demand for coverage beyond the amounts specified in the mortgage and the other allegedly unauthorized charges also provide the basis for Lass's breach-of-contract claim, her implied covenant claim does not depend on a contractual breach. Lass also argues that the Bank violated the covenant by "unreasonably exercising in bad faith any purported discretionary authority Defendants claim they were afforded under the loan and mortgage documents." Am. Compl., ¶ 75(4).

-18-

the cost of force-placed insurance may include commissions, and the Bank in fact purchased three policies at Lass's expense, two of them through a Bank subsidiary;[16] the first policy was retroactive to a date <u>before</u> the first notice letter, meaning that the Bank bought coverage for a two-month period of time that had already elapsed; and the required amount of insurance was undisputedly beyond the NFIA requirements, and perhaps beyond the terms of the mortgage agreement as well.

In arguing that the backdating claim is without merit, the Bank cites an unpublished decision upholding the purchase of retroactive lender-placed insurance. <u>See</u> <u>Webb</u> v. <u>Chase Manhattan Mortg. Corp.</u>, No. 2:05-cv-0548, 2008 WL 2230696, at \*19 (S.D. Ohio May 28, 2008). Although there may be circumstances in which such a purchase is defensible, here the property already was covered by $100,000 of flood insurance, an amount well in excess of the outstanding loan balance.[17] Moreover, whether a lender may purchase force-placed insurance coverage during the 45-day notice period required by the NFIA is a debatable question. <u>See</u> 42 U.S.C. § 4012a(e)(1), (2); Notice, Loans in Areas Having Special Flood Hazards, 76 Fed. Reg. 64175, 64179-64181 (Oct. 17, 2011). A

---

[16] The renewal coverage purchased in November 2010 and the replacement policy purchased in March 2011 were both obtained through Balboa Insurance Services, Inc., a subsidiary of the Bank.

[17] In <u>Webb</u>, the property was no longer covered at all when the plaintiff's policy lapsed. <u>See</u> 2008 WL 2230696, at \*19.

-19-

fortiori, the propriety of procuring a policy back-dated to <u>before</u> notice was given is uncertain.[18] The Bank also emphasizes that the premiums for the first two force-placed policies were refunded to Lass, and she thus suffered no "backdating" damages. The complaint, however, alleges that Lass "has not recovered a penny of the monthly overcharges that she has been forced to pay (much less interest on those overcharges)," Am. Compl., ¶ 41, and the reimbursement thus does not negate the implied covenant claim.

The allegations of self-dealing arising from the possible payment of commissions to the Bank or its related entities also are sufficiently specific to withstand motion-to-dismiss scrutiny. Lass asserts, <u>inter</u> <u>alia</u>, that the Bank purchased unnecessary insurance, at her expense, to generate a commission for the Bank or its affiliate.[19] As noted above, her complaint alleges that two of

---

[18] Lass's complaint cites and includes as an exhibit an article in <u>American Banker</u> magazine in which a spokesperson for the National Association of Insurance Commissioners stated that policies "'should not be back-dated to collect premiums for a time period that has already passed.'" <u>See</u> Jeff Horwitz, <u>Ties to Insurers Could Land Mortgage Servicers in More Trouble</u>, American Banker (Nov. 9, 2010, 12:00 PM), http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?nopagination=1&zkPrintable=1.

[19] The allegations in the complaint include the following:

75. Defendants breached [the duty of good faith and fair dealing] by, among other things: (1) misrepresenting federal flood insurance requirements; (2) misrepresenting the requirements of Plaintiff's Mortgage and other mortgage agreements; (3) demanding and/or force-placing more flood insurance than required by federal law or necessary to protect their financial interest in

the force-placed policies imposed by the Bank were obtained through its subsidiary Balboa. These allegations easily meet the threshold for a viable claim. See, e.g., Abels v. JPMorgan Chase Bank, N.A., 678 F. Supp. 2d 1273, 1276, 1278-79 (S.D. Fla. 2009) (declining to dismiss claim alleging breach of implied covenant where plaintiffs asserted that defendant "engaged in self-dealing by purchasing insurance from one of its own affiliates").

---

mortgaged properties; (4) unreasonably exercising in bad faith any purported discretionary authority Defendants claim they were afforded under the loan and mortgage documents; (5) imposing contractual requirements that did not exist or that exceeded the requirements disclosed in the relevant contracts; (6) charging borrowers sham "costs" for flood insurance that did not reflect the true cost to Bank of America and/or its affiliates (or kicked back to them) as commissions or "other compensation"; and (7) purchasing backdated insurance.

76. Defendants willfully engaged in the foregoing conduct in bad faith, for the purpose of (i) unfairly and unconscionably maximizing revenue from borrowers; (ii) generating commissions, interest, fees, and "other compensation" for BOA and its affiliates; (iii) providing a ready-made customer base for BOA's captive insurance affiliates; (iv) gaining unwarranted contractual and legal advantages; and (v) depriving Plaintiff and other Over-Insurance Class members of their contractual and legal rights to obtain a loan, extension of credit, or credit renewal (or maintain the same) without having to purchase flood insurance coverage in excess of the funds extended to them.

77. Bank of America's financial incentives in connection with force-placed insurance had led it "to force-place excessive insurance and overcharge consumers for policies that provide minimal benefit[.]" See http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?zkPrintable=1&nopagination=1 (last visited May 27, 2011).

Hence, as in <u>Kolbe</u>, we conclude that Lass's complaint alleges sufficient facts to establish a breach of the covenant of good faith and fair dealing that is "'plausible on its face,'" <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570 (2007)). The claim must therefore be reinstated.

## C. Unjust Enrichment

To succeed with an unjust enrichment claim under Massachusetts law, a plaintiff must show that the defendant received, was aware of, and accepted or retained a benefit conferred by the plaintiff "under circumstances which make such acceptance or retention inequitable." <u>Vieira</u> v. <u>First Am. Title Ins. Co.</u>, 668 F. Supp. 2d 282, 294 (D. Mass. 2009); <u>see</u> <u>also</u> <u>Cmty. Builders, Inc.</u> v. <u>Indian Motorcycle Assocs., Inc.</u>, 692 N.E.2d 964, 979 (Mass. App. Ct. 1998) ("The benefit must be <u>unjust</u>, a quality that turns on the reasonable expectations of the parties." (citing <u>Salamon</u> v. <u>Terra</u>, 477 N.E.2d 1029 (Mass. 1985))). Lass focuses this claim on the Bank's allegedly unjust retention of commissions earned in connection with the force-placed insurance, and asserts that such commissions were improper whether or not the Bank had authority to purchase the additional insurance.

The Bank argues that there cannot be an unjust enrichment claim when there is an existing contract governing the same subject matter. Alternatively, it maintains that any benefit "retained"

could not be inequitable because Lass had notice of the ramifications of failing to purchase additional flood insurance. Neither of these arguments justifies dismissal of Lass's unjust enrichment claim.

Although the Bank is correct that damages for breach of contract and unjust enrichment are mutually exclusive, see Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006) ("Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment."), it is accepted practice to pursue both theories at the pleading stage, see, e.g., Vieira, 668 F. Supp. 2d at 294-95 (noting that Federal Rule of Civil Procedure 8(d) "permits Plaintiffs to plead alternative and even inconsistent legal theories, such as breach of contract and unjust enrichment, even if Plaintiffs only can recover under one of these theories"). The Bank argues that this flexibility in pleading does not apply where, as here, the parties agree that there is a valid contract between them. The mortgage, however, does not explicitly address either commissions or, more generally, the Bank's entitlement to profit from its forced placement of insurance. Paragraph 7 states only that "the Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights." Although Lass may be able to challenge the payment of commissions to a Bank subsidiary as unnecessary and thus a breach of Paragraph 7, we need not reject her equitable claim for

-23-

reimbursement now on the ground that she is limited to the contract remedy. The case will in any event move forward, and the district court will be in a better position once the record is more developed to determine whether the unjust enrichment claim should survive.[20]

Little need be said about the Bank's assertion that any retention of a benefit was not inequitable as a matter of law because Lass knew the consequences of failing to obtain additional insurance on her own. If the mortgage did not permit the Bank to force place insurance in an amount greater than the amount of Lass's loan, the Bank's decision to do so -- with attendant benefit to itself -- would seem to fit any notion of "unjust." Lass is thus entitled to proceed with the unjust enrichment claim.

## D. Breach of Fiduciary Duty

Finally, Lass claims that the Bank had a fiduciary duty in connection with managing her escrow account and breached that duty by charging her for excessive flood insurance and related commissions. The Bank does not contest the existence of a duty, but argues that no breach occurred because the mortgage agreement permitted it to purchase the insurance and impose the costs through

---

[20] The NFIA states that the lender "may charge the borrower for the cost of premiums and fees incurred by the lender . . . in purchasing the [force-placed] insurance." 42 U.S.C. § 4012a(e)(2). We do not read this authorization for "fees" -- presumably paid to third parties -- as necessarily authorizing "commissions" paid to a Bank subsidiary. The latter might support an allegation of self-dealing, while the former would not.

the escrow account. Our discussions of the other claims inevitably lead to the conclusion that the dismissal of the fiduciary duty claim also was premature. As we have described, the mortgage agreement may not have authorized the forced placement of the additional $145,000 in flood insurance coverage. Moreover, Lass alleges that the Bank, in an act of self-dealing, improperly accepted commissions for itself or a subsidiary in connection with acquiring the additional insurance. Thus, as with the other claims, the claim for breach of fiduciary duty must be reinstated.

For the foregoing reasons, the judgment of the district court dismissing plaintiff's complaint is vacated, and the case is remanded for further proceedings consistent with this opinion. Costs are awarded to the appellant.

So ordered.

**– Dissenting Opinion Follows --**

**BOUDIN**, <u>Circuit Judge</u>, **dissenting.** On February 18, 1994, plaintiff-appellant Susan Lass obtained a loan of $40,000 secured by a mortgage on her home in Reheboth, Massachusetts, the mortgage then being immediately assigned to Shawmut Mortgage Company. The form agreement, used for mortgages in Massachusetts guaranteed by Fannie Mae and Freddie Mac, provided in pertinent part:

> 5. Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire . . . and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. . . . If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.
>
> . . .
>
> 7. Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, . . . then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property.

Another provision of Lass' mortgage provided that when making monthly mortgage payments, Lass would also pay for separate items, including property taxes and insurance premiums. The lender would hold these payments, called "escrow items," in an escrow account to cover such items when they were due.

On the same day that the mortgage was executed, Shawmut provided Lass with a separate document on company letterhead

-26-

entitled "Flood Insurance Notification" (the "Notification"). This document informed Lass that her property was located in a "special flood hazard area" and that she would need to purchase flood insurance in the following provision:

> [A]t the closing the property you are financing must be covered by flood insurance in the amount of the principle [sic] amount financed, or the maximum amount available, whichever is less. This insurance will be mandatory until the loan is paid in full.

Both the just quoted notice and the requirement that Shawmut provide such notice to Lass are imposed by federal law in aid of the government's subsidized flood insurance program. 42 U.S.C. §§ 4104a(a)(1),(a)(3) (2006). Failure to provide such notice would have subjected Shawmut to a federal monetary penalty. Id. § 4012a(f)(2). This coverage mandated by government directive is required whether or not the lender requires insurance coverage for flooding or any other hazards.

At some point prior to November 2009, defendant-appellee Bank of America or one of its affiliated entities (for convenience we refer only to Bank of America) acquired Lass' mortgage. Then, pursuant to paragraph 5 of the mortgage, Bank of America sent Lass on November 16, 2009, a form letter requiring her to purchase an additional $145,086 of flood insurance, which would insure her home up to its full replacement-cost value. The letter said that the bank would purchase the insurance if Lass failed to do so within

seven weeks, but it urged that she buy it herself to avoid a more expensive purchase by the bank.

Despite a follow up bank letter, Lass failed to increase her coverage. The bank then obtained the insurance itself for the period in question, while offering Lass a refund of any duplicative premiums if she belatedly bought the insurance elsewhere, but Lass again declined to do so. The same pattern--warning, refusal by Lass and purchase by the bank of the additional insurance--occurred in 2010, and the bank offered her a further opportunity to purchase her own insurance after it extended the policy in 2011. In each instance, the bank took the premiums out of the escrow account.

Lass responded with the present lawsuit against the bank on April 1, 2011.[21] As amended, her complaint charged breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, and a count for violation of a federal statute that is not at issue on appeal. On the bank's motion to dismiss, the district court dismissed all of Lass' counts, ruling that no claim had been stated. Lass v. Bank of America, N.A., No. 11-10570-NMG, 2011 WL 3567280, at *8 (D. Mass. Aug. 11, 2011).

The explicit language of the mortgage entitled the bank to require Lass to purchase the additional insurance even though it

_____

[21]The lawsuit is premised on the third of the three sets of forced insurance and the increased mortgage payments resulting from it, the bank having refunded the charges for the first two.

-28-

would exceed the unpaid balance of the loan. Under the agreement, Lass had to maintain insurance against "loss by fire . . . and any other hazards, including floods or flooding, for which Lender requires insurance," and this shall be "in the amounts and for the periods that the Lender requires." It is hard to imagine how the obligation could be more clearly expressed.

Lass relies upon the separate "Flood Insurance Notification" furnished by Shawmut on the day the mortgage was signed, advising her that she had to provide flood insurance to cover the "principle [sic] amount financed, or the maximum amount available, whichever is less . . . until the loan is paid in full." But the agreement says explicitly that flood insurance "shall be maintained in the amounts and for the periods that Lender requires," indicating that the lender can require a different amount in a later period (emphasis added).

The separate Flood Insurance Notification, establishing specific minimums (because the government so requires), does not purport to qualify this unequivocal obligation to maintain any hazard insurance in the amounts and for the periods the lender requires. Nor does the Flood Insurance Notification in any way conflict with or contradict this obligation: it merely establishes a government required minimum for flood insurance regardless of whether the lender requires insurance in a lesser amount or in no amount at all.

-29-

Nor does the provision allowing the bank to purchase insurance "to protect Lender's rights in the Property" require that the insurance be limited to the unpaid balance.  By virtue of its provision of the loan and the risks of nonpayment, the lender has an interest both in the loan amount and in the stream of interest payments; both give it ample reason to insist on insurance that goes beyond the unpaid balance of the loan and up to the replacement cost.  This is a practice is recommended by the Federal Emergency Management Agency and not at all unusual.[22]

Because the loan agreement explicitly allows the lender to increase the amount of flood insurance and to purchase the insurance if the mortgagor refused, the bank's demand and purchase cannot themselves violate the implied covenant.  See Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005) ("This implied covenant may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." (internal quotation marks omitted)).  Nor can Lass argue that the

---

[22]National Flood Insurance Program: Mandatory Purchase of Flood Insurance Guidelines 27 (2007), http://www.fema.gov/library/viewRecord.do?id=2954. See generally Wells, Insuring to Value: Meeting a Critical Need (2d ed. 2007) (advocating that property owners insure to the full replacement cost of property); Klein, When Enough Is Not Enough: Correcting Market Inefficiencies in the Purchase and Sale of Residential Property Insurance, 18 Va. J. Soc. Pol'y & L. 345 (2011) (suggesting that insuring to a value below replacement cost constitutes "underinsurance," a widespread problem caused by market inefficiencies).

request for insurance up to replacement cost is extravagant or irrational.  See note 22, above.

As an alternative argument, Lass asserts--offering various legal theories--that the bank charged an excessive amount for the insurance, and did so to generate commissions for itself as the purchaser of the insurance.  Lass alleges that Bank of America

> charg[ed] borrowers sham 'costs' for flood insurance that did not reflect the true cost to Bank of America because a portion of such 'costs' were retained by Bank of America and/or its affiliates (or kicked back to them) as commissions or 'other compensation,' . . . [and that Bank of America did so] for the purpose of . . . generating commissions, interest, fees, and 'other compensation' for BOA and its affiliates.

Compl. ¶¶ 75, 76.

The bank repeatedly urged Lass to procure the additional insurance for herself; indeed, she already had flood insurance and could doubtless have increased her coverage--albeit for an increased premium.  Specifically, the bank sent Lass six letters warning that bank-provided coverage might be more expensive than insurance that Lass could obtain on her own and exhorting Lass to buy her own insurance in terms such as "we urge you," "we continue to encourage you," or "BAC Home Loans strongly encourages you." Several of these exhortations were set off in boldface type for emphasis.  After each purchase, the bank even offered to cancel its lender-placed insurance and refund any duplicative premiums if Lass bought her own insurance.

-31-

Thus, the bank unquestionably had a legitimate interest in having the higher coverage to protect its loan _and_ it repeatedly urged that Lass buy it herself. Given these circumstances, the notion that it sought the additional coverage so as to obtain the commission is unsupported by any facts alleged in the complaint that would make the "improper motive" charge remotely "plausible." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Finally, Lass appears to claim that the bank overcharged her for the insurance it obtained. Three theories are offered: the covenant of good faith and fair dealing, unjust enrichment, and a fiduciary duty claim based on the fact that the bank drew on the escrow account to pay for the added insurance. In principle one can imagine that a bank, having properly insisted on replacement cost insurance and properly invoked its right to buy the insurance because the borrower refused, might nevertheless create liability for itself by imposing exorbitant or manifestly unfair charges.

However, Lass' mortgage authorized the bank to fix the level of insurance, purchase it directly if Lass refused, and pay for it out of the escrow account, so all three claims would require some factual allegations that pointed to a lack of "good faith and fair dealing" in the price charged, T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d 696, 704 (Mass. 2010)(covenant claim), an "unjust" profit, Keller v. O'Brien, 683 N.E.2d 1026, 1029 (Mass.

-32-

1997) (unjust enrichment), or unconscionable self-dealing, <u>NRT New England, Inc.</u> v. <u>Moncure</u>, 937 N.E.2d 999, 1004 (Mass. App. Ct. 2010) (escrow claim).

The only relevant allegation in the complaint, quoted above, amounts to saying that the bank obtained a commission on the placement of the insurance. Placing insurance in exchange for commissions is what independent agents do all the time, and the bank can hardly place insurance without incurring costs of its own. Calling these "sham" costs or kickbacks is pure rhetoric, or "bald allegations" to which the district court was not required to defer, <u>Iqbal</u>, 556 U.S. at 681, especially because of the ease of pleading real facts (if they existed).

Lass could have compared what the bank took out of the escrow account as the cost of the additional insurance premium including any commission with comparable insurance provided through independent agents; possibly the discrepancies might have been great enough to make it possible, absent adequate explanation by the bank, to raise an inference that the bank was unduly profiting or otherwise unreasonable in how it went about the placement of the insurance. But the complaint provides nothing of the sort.

Finally, Lass complains that when the bank purchased insurance for her in January 2010, it made the policy effective as of November 1, 2009, charging her for over two months already passed. The bank requested that she buy more insurance by letter

dated November 16, 2009, and the benefit of backdating the insurance is itself unexplained. But the bank gave Lass a full refund for the backdating policy before Lass initiated this litigation.

To sum up, the lender's requirements in the loan agreement as to hazard insurance were adequately, if not perfectly, expressed (one has only to contrast paragraph 5 with the gibberish typical in insurance policies); the bank's apparent choice to insist on replacement cost as a matter of course is likely over-rigid from a policy standpoint but that is a matter for regulators. There is nothing to warrant further proceedings in this case.